NICHOLSON et al., Appellants,

v.

TURNER/CARGILE et al., Appellees.

[Cite as *Nicholson v. Turner/Cargile* (1995), 107 Ohio App.3d 797.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95APE06–681.

Decided Dec. 19, 1995.

798

*Chorpenning, Good & Mancuso Co., L.P.A.,* and *Darin G. Kendall,* for appellant Beth L. Nicholson.

*William L. Stehle Co., L.P.A.,* and *William L. Stehle,* for appellant Estate of Walter W. Darst, Jr.

*Smith & Colner* and *James D. Colner,* for appellant Robin Starr.

*Squire, Sanders & Dempsey, David W. Alexander* and *Roger D. Branigin,* for appellees Korda/Nemeth Engineering, Inc., Peter Korda and David Holtzapple.

*Lane, Alton & Horst* and *Mary Barley–McBride,* for appellee Robert P. Madison International, Inc.

PEGGY BRYANT, Judge.

Plaintiffs-appellants, Beth L. Nicholson, Walter W. Darst, Jr. and Sherri D. Starr, appeal from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Robert P. Madison International, Inc. ("Madison"), Korda/Nemeth Engineering, Inc. ("Korda/Nemeth"), and Korda/Nemeth's individual engineers Peter Korda and David A. Holtzapple.

In October 1987, the state hired Madison to provide architectural, engineering, construction management and administrative services for erection of Ohio State University's Prime Site Computer Building in Columbus, Ohio. To satisfy the structural engineering portions of its contract, Madison subsequently hired Korda/Nemeth.

Plaintiffs assert that on May 18, 1990, David Holtzapple, representing Korda/Nemeth, visited the construction site. On that day, Holtzapple allegedly observed plaintiffs' decedents installing cantilevered beams by utilizing an unsafe leveling procedure. On May 22, 1990, as plaintiffs' decedents were employing this procedure, structural steel collapsed upon them, causing their deaths.

On May 19, 1992, plaintiffs filed wrongful death claims asserting the negligence of the above-named defendants and other defendants not party to this appeal. In response to a motion for summary judgment filed by Korda/Nemeth, the trial court on March 24, 1994, ruled that the engineering firm owed no legal duty to plaintiffs' decedents. In response to a motion for summary judgment later filed by Madison, the trial court ruled that Madison also owed no legal duty to plaintiffs' decedents. On May 5, 1995, by agreement of the parties, the trial court

entered an amended judgment entry granting summary judgment to Peter Korda and David Holtzapple, as the trial court concluded that those individual defendants similarly owed no duty to plaintiffs' decedents. From that entry, plaintiffs brought this timely appeal, assigning the following errors:

"I. The trial court erred in holding as a matter of law that Korda–Nemeth and Holtzapple had no contractual or tort duty to prevent and/or stop the unsafe cantilevered beam leveling procedure that caused the May 22, 1990 collapse of the structural steel and appellants' decedents' death where its project engineer was actually on the job site and up on the structural steel on May 18, 1990 in close proximity to the decedent ironworkers while they were using the same unsafe leveling procedures.

"II. The trial court erred as a matter of law when it held that Madison had no contractual duty to stop unsafe construction procedures its field representative actually observed, where the architect contracted to the owner 'to make on-site observations and keep the owner informed of the progress and quality of the work and to endeavor to guard the owner against defects and deficiencies in the work of the contractors' and 'to provide on-site observations to check the quality and quantity of the work.'

"III. The trial court erred as a matter of law in holding that Madison had no common law duty to stop the unsafe practices it observed at the job site."

Civ.R. 56(C), governing entry of summary judgment, states that the moving party is entitled to judgment when no genuine issue exists as to any material fact, and reasonable minds must conclude in favor of the moving party. The party moving for summary judgment bears the burden of establishing that no genuine issue of fact exists, but the motion forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus, citing *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

Here, to establish actionable negligence, plaintiffs must prove the existence of a duty defendants owed to plaintiffs' decedents, the breach of that duty, the direct and proximate causation between defendants' breach and plaintiffs' decedents' injuries, and damages. *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938; *Johnson v. Univ. Hospitals of Cleveland* (1989), 44 Ohio St.3d 49, 540 N.E.2d 1370. The trial court premised its decision on the first prong of the four-prong test, the lack of any duty defendants owed to plaintiffs' decedents.

Plaintiffs' three assignments of error are interrelated; thus we address them jointly. In them plaintiffs allege that Korda/Nemeth, Korda, Holtzapple, and

Madison had contractual, tort, and statutory duties to stop or prevent the decedents' unsafe leveling practices. We first address plaintiffs' assignments of error as they relate to contractual duties.

In arguing that Madison had a contractual duty to stop or prevent the unsafe leveling procedures, plaintiffs focus in particular on sections within Madison's contract with the state which provide that Madison shall visit the work site to "become generally familiar with the progress and quality of the work and to determine in general if it is proceeding in accordance with Construction Drawings and Specifications." According to the contract, on making these on-site observations, Madison shall inform the Deputy Director of the Division of Public Works of the "progress and quality of the work and shall endeavor to guard the Deputy Director against defects and deficiencies in the work of the Contractor."

To establish a similar contractual duty for Korda/Nemeth and its individual engineers, plaintiffs focus upon nearly identical language within the contract between Madison and Korda/Nemeth. Paragraph 2.6.3 of the Madison–Korda/Nemeth contract states that Korda/Nemeth shall visit the site "to become generally familiar with the progress and quality of the Work * * * and to determine in general if the Work is being performed in a manner indicating that the Work, when complete, will be in accordance with the Contract Documents." According to the terms of the contract, on making these on-site inspections, Korda/Nemeth shall keep Madison "informed of the progress of the Work * * * and shall endeavor to guard [the state] against defects and deficiencies in such Work."

Plaintiffs' argument, however, ignores more specific contractual provisions which not only hold the contractor responsible for building processes, but also dictate that Madison is not responsible for the contractor "in the building process." Indeed, Section 1.5.8 explicitly relieves Madison from certain responsibilities of the contractor, stating that Madison:

" * * * [S]hall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work and * * * shall not be responsible for the Contractor's failure to carry out the work in accordance with the Construction Drawings and Specifications."

The contract between the state and Madison further insulates Madison from responsibility for the contractor's acts, stating that Madison:

" * * * [S]hall not be responsible for the acts or omissions of the Contractors, their subcontractors or material suppliers, or any of the Contractors or subcontractor's agents or employees or any other persons performing any of the work."

In turn, the contract between Madison and Korda/Nemeth contains similar provisions relieving Korda/Nemeth from responsibility for other's acts. Specifically, Section 1.1.8 of the Madison–Korda/Nemeth contract states that Korda/Nemeth "shall not be responsible for the acts or omissions of the Architect, Architect's other consultants, Contractor, Subcontractors, their agents or employees, or other persons performing any of the Work." Korda/Nemeth also agreed that while visiting the work site, it would "determine in general if the Work [was] being performed in a manner indicating that the Work, when completed, [would] be in accordance with the Contract Documents." As part of those site visits, however, Korda/Nemeth is not "required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work * * *." Korda/Nemeth's approval of plans also does not constitute its approval of safety precautions, "construction means, methods, techniques, sequences or procedures." Rather, Korda/Nemeth explicitly is not responsible for "construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work * * *," as those activities remain the contractor's sole responsibility.

While plaintiffs' construction of the pertinent contracts ignores the sections limiting the responsibility of architect and engineer ("design professionals") concerning safety, construction means, and techniques, those provisions dictate that Madison and Korda/Nemeth had no contractual duties to advise the contractor of hazardous construction procedures or to make the site safe. See *Young v. Miller Bros. Excavating, Inc.* (July 26, 1989), Montgomery App. No. 11306, unreported, 1989 WL 83925 (construing virtually identical language in a contract between the owner and the contractor and concluding that a provision calling for the engineers' on-site inspections did not require them to inspect for hazards). Because Madison's and Korda/Nemeth's on-site inspections were for the purpose of insuring that the construction met with the architect's design specifications, they did not have a contractual duty to make the construction site safe for the general construction workers. *Id.*

Plaintiffs nonetheless rely on their expert engineer who interprets the contracts to impose such a duty on defendants. The contract terms, however, are unambiguous and control; any expert opinion interpreting them has no effect. See *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379 ("if a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined"); *Davis v. Loopco Industries, Inc.* (1993), 66 Ohio St.3d 64, 66, 609 N.E.2d 144, 145; *P & O Containers, Ltd. v. Jamelco, Inc.* (1994), 94 Ohio App.3d 726, 731, 641 N.E.2d 794, 797 ("the interpretation of a written contract is a question of law, absent patent ambiguity").

For the foregoing reasons, plaintiffs' assertions that defendants had contractual duties to stop or prevent the unsafe leveling practice are unpersuasive. To the extent the assignments of error relate to contractual duties, those assignments of error are rejected.

Even in the absence of contractual provisions, plaintiffs contend that if Madison's or Korda/Nemeth's on-site representatives actually saw the unsafe leveling practice, defendants had a common-law tort duty to stop or prevent the unsafe practice. Because plaintiffs' contentions raise an issue of first impression in Ohio, we look to analogous areas of the law for guidance in resolving plaintiffs' argument.

Ohio case law addresses a similar situation when it develops the duties general contractors owe to the employees of independent subcontractors. Ordinarily, general contractors owe no duty to the workers employed by independent subcontractors. A contractor's duty may arise, however, if it either actively participates in the subcontractor's work or explicitly assumes responsibility for worker safety. As the Supreme Court held in *Cafferkey v. Turner Constr. Co.* (1986), 21 Ohio St.3d 110, 113, 21 OBR 416, 419, 488 N.E.2d 189, 192, "[a] general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." Because erection of a building constitutes inherently dangerous work, general contractors typically owe no duty to employees of independent subcontractors. *Michaels v. Ford Motor Co.* (1995), 72 Ohio St.3d 475, 478, 650 N.E.2d 1352, 1355, fn. 4.

However, a general contractor owes such workers a duty when it "actually participates in the job operation" performed by the subcontractor. *Cafferkey, supra,* 21 Ohio St.3d at 112, 21 OBR at 417, 488 N.E.2d at 191; *Hirschbach v. Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St.3d 206, 208, 6 OBR 259, 260, 452 N.E.2d 326, 328. Such active participation results when the general contractor "direct[s] the activity which resulted in the injury and/or [gives] or denie[s] permission for the critical acts that [lead] to the employee's injury." *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 650 N.E.2d 416, syllabus; *Pifher v. Ford Motor Co.* (Aug. 10, 1994), Lorain App. No. 93CA005581, unreported, 1994 WL 431544. Without other activity, however, a general contractor's exercise of his supervisory role does not constitute "active participation" so as to create a duty. *Bond, supra,* 72 Ohio St.3d at 335, 650 N.E.2d at 419. Thus, a duty does not arise just because the general contractor retains power to monitor and coordinate activities, for the "very nature of the construction business requires a general contractor * * * to 'supervise' a construction job." *Michaels,*

*supra,* 72 Ohio St.3d at 479, 650 N.E.2d at 1356, citing *Bond, supra,* at 339, 650 N.E.2d at 422.

■ While a general contractor may also explicitly assume responsibility for workers' safety, many contract provisions between general contractors and subcontractors do not give rise to such assumed responsibility. *Cafferkey,* 21 Ohio St.3d at 113, 21 OBR at 419, 488 N.E.2d at 192. Contract provisions that *do not* create such a duty include provisions (1) assigning control over safety procedures to the general contractor, *id.;* (2) retaining a general contractor's right to review details and construction; (3) requiring that the work be finished under an architect's and general engineer's direction and to their satisfaction, *Gilday v. S & R Playhouse Realty Co.* (June 14, 1990), Cuyahoga App. No. 57022, unreported, 1990 WL 82301; (4) promising that a general contractor will have a representative at the job site; (5) requiring that a general contractor specify the work to be done by the subcontractor and specifying the items the general contractor will inspect; (6) requiring a subcontractor to replace personnel found to be incompetent; and (7) promising that material supplied by the subcontractor will meet specifications. *Mount v. Columbus & S. Ohio Elec. Co.* (1987), 39 Ohio App.3d 1, 528 N.E.2d 1262, paragraph four of the syllabus. Indeed, in the context of a general contractor's role in safety matters, the Supreme Court considered contractual language similar to that found in this case, and labelled such language "nothing more than standard 'boilerplate' terminology common to virtually all construction contracts." *Cafferkey, supra,* 21 Ohio St.3d at 113, 21 OBR at 418, 488 N.E.2d at 192.

■ If we apply here by analogy the cases concerning a general contractor's duty to a subcontractor's employees, then an architect or engineer generally has no duty to the employees of independent subcontractors, unless the architect or engineer actually participates in subcontractors' work or explicitly contracts for safety responsibilities.

■ This rule is consistent with Ohio law concerning design professionals' liability for third parties' economic damages. Specifically, absent direct contractual privity between a design professional and an injured third party, the design professional sued for professional negligence generally is not liable for a third party's economic damages. *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206. Despite the lack of privity, however, a design professional's significant participation in a contractor's work may create a nexus that substitutes for contractual privity. *Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.* (1993), 90 Ohio App.3d 215, 220, 628 N.E.2d 143, 146. Thus, a design professional is not liable for third party economic damages when he or she does not participate in the project or interact

with the contractor and signs a standard contract providing the design professional no role in construction means, methods, techniques or procedures; but a design professional who exercises "excessive control over the contractor" through the power to stop the work and give orders about the project is liable for such economic damages. *Id.* at 220–221, 628 N.E.2d at 146–147.

Because the record lacks evidence suggesting defendants actively participated in the construction at issue or assumed responsibility for safety procedures, defendants would not be liable in tort to plaintiffs even by analogy. Plaintiffs urge, however, that design professionals have a duty in law to prevent or stop dangerous conditions or practices when they are actually aware of those hazards.

Plaintiffs suggest that design professionals have such a duty because plaintiffs submitted an affidavit of their expert witness, an engineer, who described such a duty and opined that defendants breached that duty. Despite the expert's opinion, issues concerning the existence of duty remain questions of law. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269, quoting Prosser, Law of Torts (4 Ed.1971) 325–326 ("there is no formula for ascertaining whether a duty exists. Duty * * * is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection"); *Slagle v. White Castle Systems, Inc.* (1992), 79 Ohio App.3d 210, 216, 607 N.E.2d 45, 49. Thus, deposition testimony, expectations of the parties and expert testimony have no effect upon the determination of duty.

Given the absence of Ohio law concerning design professionals' liability for their work site supervision, plaintiffs next base their argument on Kansas and New Jersey decisions.

For example, the Kansas Supreme Court in *Balagna v. Shawnee Cty.* (1983), 233 Kan. 1068, 668 P.2d 157, held that an architect-engineer violated his duty to a contractor's employee killed by a collapsing sewer wall. The Kansas court found that although the architect-engineer discovered the safety violations that later caused the collapse, he failed to take action. While the court noted that a design professional's duty to supervise or administer the construction work generally involves only " 'a duty to see that the building when constructed meets the plans and specifications for which the owner agreed to pay,' " *id.* at 1074, 668 P.2d at 163, quoting *Hanna v. Huer, Johns, Neel, Rivers & Webb* (1983), 233 Kan. 206, 662 P.2d 243, paragraph two of the syllabus, it further stated that a design professional may not "stand idly by with actual knowledge of unsafe practices on the jobsite and take no steps to advise or warn the owner or contractor." *Id.,* citing *Hanna, supra,* at paragraph four of the syllabus.

A New Jersey appellate court drew similar conclusions in *Carvalho v. Toll Bros. & Developers* (N.J.Super.A.D.1995), 278 N.J.Super. 451, 455, 651 A.2d 492, 494, when the on-site engineer had actual knowledge that workers were not employing certain safety precautions. Although the engineer supervising the work site did not have any contractual obligation to inspect for hazards, his actual knowledge of a dangerous condition triggered a duty to take reasonable action. *Id.* at 460, 651 A.2d at 497.

Conversely, defendants cite numerous foreign cases in which design professionals are liable for their on-site supervision only when they actively participate in the work site construction or when they contractually assume responsibility for workers' safety. See, *e.g., Frampton v. Dauphin Distrib. Serv. Co.* (1994), 436 Pa.Super. 486, 492, 648 A.2d 326, 329 ("an architect, in the absence of a duty specially imposed by contract or course of conduct, has no duty to take affirmative action to protect workers from hazards on the job site which are either known or readily visible"); *Rodriguez v. Universal Fastenings Corp.* (Tex.App. 1989), 777 S.W.2d 513, 515 (engineer not negligent for injuries to workers for their failure to use the proper scaffolding because contract provided that contractor was responsible for use of proper scaffolding); *Hanna, supra,* 662 P.2d 243, paragraph three of the syllabus (factors to be considered in determining whether an architect has assumed responsibility for safety practices include [1] actual supervision and control of the work; [2] retention of the right to supervise and control; [3] constant participation in ongoing activities at the construction site; [4] supervision and coordination of subcontractors; [5] assumption of responsibility for safety practices; [6] authority to issue change orders; and [7] the right to stop the work).

While the Kansas and New Jersey cases found the design professional had actual knowledge of the dangerous condition, *Carvalho, supra,* 651 A.2d at 498; *Balagna, supra,* 668 P.2d at 164, defendants' citations do not find that the design professional had any actual knowledge of the condition. Plaintiffs' and defendants' cases are best reconciled by concluding that if design professionals have actual knowledge of a hazard, they then have a duty to stop or prevent the dangerous condition or practice. If design professionals, however, do not have actual knowledge, their tort duties arise if they actively participate in the construction or explicitly assume responsibility for worker safety.

Assuming the existence of such a theory which reconciles the cases plaintiffs and defendants rely on and thus creates a duty arising from design professionals' supervision, plaintiffs have not set forth sufficient evidence to establish that Madison and Korda/Nemeth actually breached such a duty. Those decisions holding that design professionals have a duty to workers to stop or prevent hazardous conditions or practices all affirmatively find that the design profession-

al actually saw the unsafe condition or practice and actually recognized its inherent danger. Here, plaintiffs cannot establish a genuine issue of material fact that Madison's or Korda/Nemeth's representatives actually saw the dangerous leveling procedure.

With the conflicting evidence construed in favor of plaintiffs, the record shows Korda/Nemeth's representative, David Holtzapple, visited the work site four working days before the accident for about forty to fifty minutes and walked somewhere on the structural steel. Plaintiffs also presented evidence that sometime during the day Holtzapple visited, plaintiffs' decedents were leveling beams and openly employing the dangerous procedure.

The foregoing evidence, however, does not place Holtzapple within the decedents' proximity as they were using the unsafe leveling procedure. Contrary to plaintiffs' assertions, they need to show more than that Holtzapple was on the structural steel on a day when the decedents were utilizing the unsafe procedure; they must set forth evidence suggesting that Holtzapple actually saw the procedure and recognized it as dangerous. Here, plaintiffs cannot establish a genuine issue of material fact in that regard. Indeed, plaintiffs are forced to rely on speculation to make the bridge between Holtzapple's presence and his knowledge of ongoing procedures. Accordingly, on the evidence before us, reasonable minds cannot conclude that Holtzapple actually saw the procedure and appreciated its danger.

Plaintiffs also allege that Greg Gutman, Madison's field representative, actually observed the unsafe leveling procedure and recognized its danger. With the evidence again construed in plaintiffs' favor, the record shows that Gutman observed some of the steel erection, but he did not inspect the structural steel. Gutman's statement that he "really couldn't say" whether he observed the workers performing the unsafe procedure does not constitute evidence that he viewed the procedure, and plaintiffs cannot point to any additional evidence suggesting that Gutman was in a position to see, or actually saw, the unsafe procedure and appreciated its danger. Accordingly, again no genuine issue of material fact exists whether representatives of Madison actually saw the unsafe leveling procedure.

As a result, even if we were to create a duty on the part of these design professionals, plaintiffs have not set forth essential facts giving rise to that duty.

For the foregoing reasons, to the extent that plaintiffs' assignments of error argue a common-law duty and breach of that duty, we overrule the assigned errors.

 Lastly, plaintiffs argue that Korda/Nemeth's failure to comply with the Ohio Basic Building Code ("OBBC") constitutes negligence *per se*. Plaintiffs

assert that Korda/Nemeth did not comply with OBBC 1201.3, requiring designs to provide for "temporary stresses."

Initially, failure to comply with the OBBC does not constitute negligence *per se;* negligence *per se* involves violations of legislative enactments, not violations of administrative provisions. Thus, failure to comply with the OBBC cannot constitute negligence *per se. Zimmerman v. St. Peter's Catholic Church* (1993), 87 Ohio App.3d 752, 755, 622 N.E.2d 1184, 1186; *Simon v. Drake Constr. Co.* (1993), 87 Ohio App.3d 23, 26, 621 N.E.2d 837, 839, citing *Schwirtz v. Berry* (Sept. 1, 1983), Cuyahoga App. No. 46305, unreported, 1983 WL 4677 (held building code violation does not establish negligence *per se* ).

Plaintiffs nonetheless argue that Korda/Nemeth also did not meet the standard of engineering care because it did not comply with OBBC 1201.3. Plaintiffs again attempt to use their expert witness both to interpret Korda/Nemeth's obligation under OBBC 1201.3 and to establish that Korda/Nemeth breached that obligation.

While expert testimony may be used to establish breach of a standard created by statute or rule, such testimony is not admissible to interpret statutory terms which create the standard. *Payne v. A.O. Smith Corp.* (S.D.Ohio 1985), 627 F.Supp. 226, 228 (expert may not testify as to the rules and procedure of Consumer Product Safety Commission, but expert may testify as to industry practices which are not a matter of law); see, also, *Eagan v. Marr Scaffolding Co.* (1982), 14 Mass.App.Ct. 1036, 1037, 442 N.E.2d 743, 745 (expert could testify whether platform was capable of meeting rules and regulations for prevention of accidents); Rogers, The Law of Expert Testimony (3 Ed.1941) 38, 44, 293 (a qualified witness may testify to methods in general use in a specific type of construction, but the expert may not testify to questions involving points of law). Thus, when a professional's duty is set forth in statutes and regulations, an expert may not define the duty by interpreting statutory and regulatory terms. *State v. Walsh* (1979), 66 Ohio App.2d 85, 100, 20 O.O.3d 178, 187, 420 N.E.2d 1013, 1022 (expert may not perform trial court's function of determining legal significance of certain statements within securities offering; expert improperly "addressed very technical legal issues"). To the extent that plaintiffs' expert testifies to the meaning of "temporary stresses" within the building code, that testimony is not relevant to a determination of any duty the OBBC requirements impose on Korda/Nemeth.

Absent their expert's opinion, plaintiffs assert that the building code requires Korda/Nemeth to account for temporary stresses, which includes decedents' unsafe construction procedures. We, however, can find no indication that accounting for "temporary stresses" requires a design professional to provide for a potentially unlimited array of unsafe construction procedures. See, *e.g.,* American Institute of Steel Construction, Inc. ("AISC"), Manual of Steel Construction:

Allowable Stress Design (9 Ed.1989) M4 (temporary bracing and leveling shall be in accordance with American Institute of Steel Construction Code of Standard Practice); AISC Code of Standard Practice, *supra*, at 7.9 (temporary supports and other elements required for erection operation shall be determined by the erector and temporary supports shall support loads comparable to those for which the structure was designed, resulting from wind, seismic forces and erection operations, but not the loads resulting from the performance of work by others).

While the trial court opinion does not consider the meaning of "temporary stresses" as a matter of law, the term does not include unsafe construction procedures. Although the OBBC sets forth a duty to provide for "temporary stresses," the code does not create a duty to account for all potentially unsafe construction methods. Korda/Nemeth, therefore, did not breach its duty to account for "temporary stresses" when it failed to predict decedents' unsafe leveling procedure. Thus, to the extent plaintiffs' assigned errors rely on defendants' breach of a duty established under the OBBC, those assignments of error are overruled.

For the foregoing reasons, we overrule plaintiffs' assignments of error and affirm the judgment of the trial court.

*Judgment affirmed.*

TYACK and HOLMES, JJ., concur.

ROBERT E. HOLMES, J., retired, of the Supreme Court of Ohio, sitting by assignment.