CAMPBELL, Appellant,

v.

THE DAIMLER GROUP, INC. et al., Appellees.

CORRIVEAU–CLARK, Admr., Appellant,

v.

The DAIMLER GROUP, INC. et al., Appellees.

[Cite as *Campbell v. The Daimler Group, Inc.* (1996), 115 Ohio App.3d 783.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 96APE03-291 and 96APE03-295.

Decided Nov. 26, 1996.

784

*Matan, Geer & Wright, Eugene L. Matan* and *Robert D. Noble,* for appellant Brian Campbell.

*Hamilton, Kramer, Myers & Cheek, James R. Gallagher, David H. Starkey* and *Tamara N. Smith,* for appellant Katy Corriveau–Clark.

*McNamara & McNamara, John L. Miller* and *Dennis D. Liston,* for appellee The Daimler Group, Inc.

*Squire, Sanders & Dempsey, David W. Alexander* and *Roger D. Branigin,* for appellee Korda/Nemeth Engineering, Inc.

*John C. Nemeth & Associates, John C. Nemeth* and *William J. Christensen,* for appellee Northeast Concrete & Construction, Inc.

*Wirtz & Kohn, Dennis P. Wirtz* and *Jeffrey L. Kohn,* for appellee Concord Fabricators, Inc.

*Porter, Wright, Morris & Arthur* and *Joyce D. Edelman,* for appellees Huntington National Bank, Huntington BancShares, Inc., and Huntington Mortgage Company.

*James J. Marlin, Jr.,* for appellee Geotechnical Consultants, Inc.

*Lane, Alton & Horst, Jeffrey W. Huston* and *Mary Barley–McBride,* for appellee Bohm-NBBJ, Inc.

---

PETREE, Presiding Judge.

Plaintiffs, Brian Campbell and Katy Corriveau–Clark, Administrator of the Estate of Donald Clark, deceased, appeal from judgments of the Franklin County Court of Common Pleas in favor of defendants Korda/Nemeth Engineering, Inc., Northeast Concrete Construction, Inc., and The Daimler Group, Inc.

Plaintiffs set forth the following assignments of error:

"[1.] The trial court committed prejudicial error in granting the motion for summary judgment filed by Korda Nemeth Engineering. There was an issue of material fact that precluded the granting of such motion.

"[2.] The trial court erred in refusing to allow appellant[s] to conduct a voir dire examination of appellees' expert, Peter Korda, regarding an in-court experiment performed by him.

"[3.] The trial court erred in allowing appellees' expert, Peter Korda, to conduct his in-court experiment without the required foundation to show that the conditions of [the] experiment were substantially similar to those of the construction site at the time of the building's collapse. The experiment purported to compare the merits of cross-bracing with that of proper anchors in a structure, which was the ultimate issue to be decided by the jury.

"[4.] [The] trial court committed prejudicial error in refusing to allow Dale Campbell, the President of Seneca Steel Erectors, to render an opinion as to the cause of the building's collapse."

In 1991, defendant The Daimler Group, Inc. ("Daimler Group") was hired by Huntington National Bank ("HNB") to manage the construction of the HNB Mortgage Operations Center in Columbus, Ohio. Defendant Korda/Nemeth Engineering, Inc. ("Korda/Nemeth") was subsequently hired by the project's architect to perform engineering design work. Thereafter, defendant Northeast Concrete and Construction, Inc. ("Northeast") was hired as the concrete contractor and Seneca Steel Erectors ("Seneca Steel") was hired to erect the steel frame.

During the spring of 1991, Northeast poured concrete pads for the first of the four phases of construction. Northeast was also responsible for sinking anchor bolts into the concrete pads. The original design plans drawn up by Korda/Nemeth called for fourteen-inch-by-three-quarter-inch steel anchor bolts, which were to be imbedded nine inches deep into the concrete slab.

In pouring the concrete slabs for the first phase of the project, Northeast set several of the anchor bolts in the wrong place. When informed of this problem, Steven Rice, construction supervisor for Daimler Group, contacted Dave Holtzapple, the design engineer with Korda/Nemeth. Holtzapple authorized the use of three-quarter-inch expansion anchor bolts, commonly known as the "Hilte Quick-bolt." Accordingly, Northeast burned off the original bolts and imbedded Hilte Quick-bolts into the concrete slabs. The substitution of the Hilte Quick-bolts was noted in the "general notes" or "field notes," which became part of the project design plans.

When Seneca Steel began erecting steel columns in phase one of the project, it encountered problems trying to straighten or "plumb" some of the columns. Several of the Hilte Quick-bolts would not tighten properly and, in one instance, a

bolt pulled completely out of the concrete slab. Eventually, Seneca Steel was able to straighten the columns with the aid of heavy machinery.

When phase one neared completion, Steve Rice notified Dale Campbell, the owner of Seneca Steel, that preliminary construction in phase two was not yet complete. Rice told Campbell that Seneca Steel should begin construction of phase four, out of sequence.

The erection of steel columns and beams in phase four was underway on June 1, 1992, when one of the columns in row C began to lean. Seneca Steel attached a guy wire to column C–2 to provide support. On June 2, 1992, Dale Campbell was using a crane to place bundles of steel joists atop the structure; decedent was working at the top of a steel frame. According to Dale Campbell, one of his employees told him that two of the columns in row C were leaning. Moments later, Campbell heard a snapping sound and saw the structure crash to the ground. Decedent fell from the structure and was killed. Campbell did not learn that Hilte Quick-bolts had also been used in phase four of the project until after the accident occurred.

Plaintiff Katy Corriveau–Clark was appointed administrator of decedent's estate. On April 22, 1993, plaintiffs filed the instant action seeking damages from several defendants for the wrongful death of decedent, Donald Clark. Seneca Steel, Korda/Nemeth, Northeast, Daimler Group, and HNB were among the named defendants.[1] Defendant Korda/Nemeth filed a motion for summary judgment, which granted by the trial court in a decision dated June 30, 1995. A judgment entry was journalized on July 18, 1995.

Thereafter, the case proceeded to a jury trial against the remaining defendants, Northeast and Daimler Group. The jury returned a verdict in favor of both defendants and, on February 7, 1996, the trial court entered judgment upon the jury verdicts. Plaintiffs appeal to this court from the July 18, 1995 judgment in favor of Korda/Nemeth and the February 7, 1996 judgments in favor of Northeast and Daimler Group.

In plaintiffs' first assignment of error, plaintiffs contend that the trial court erred when it granted summary judgment in favor of Korda/Nemeth. Under Civ.R. 56, summary judgment is proper when (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and in viewing the evidence most strongly in

---

1. Summary judgment was granted by the trial court in favor of defendant HNB on August 1, 1995. This judgment was not designated by plaintiffs in their notice of appeal, nor are there any assignments of error related to that judgment contained in plaintiffs' brief. HNB's unopposed motion to dismiss the appeal, as to Huntington, is hereby granted.

favor of the party against whom the motion is made, that conclusion is adverse to that party. *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129; *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 617 N.E.2d 1068.

The trial court held the Korda/Nemeth's contract with the architectural contractor determined the extent of the company's duty to plaintiffs' decedent.[2] The trial court found that the limitation of liability provision contained in the contract shielded Korda/Nemeth from any liability to plaintiffs as a matter of law. The contract provides, in relevant part:

"The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work."

In *Nicholson v. Turner/Cargile* (1995), 107 Ohio App.3d 797, 669 N.E.2d 529, this court recently dealt with an issue similar to the one presented herein. In that case, a design engineering firm was sued for damages arising out of the death of an employee of a subcontractor. The employee had been killed during the installation of a cantilever beam. In plaintiff's complaint it was alleged that the engineering firm was negligent in failing to warn decedent's employer that it was using an unsafe procedure to install the beam. In affirming a summary judgment granted in favor of the firm, we held that the provisions of the AIA contract shielded the firm from liability to the employee of the subcontractor for any damages arising from the negligent construction procedure employed by a subcontractor. *Id.*, 107 Ohio App.3d at 802–803, 669 N.E.2d at 532–533.

 Korda/Nemeth relies on the *Nicholson* decision as support for the trial court's judgment in this case. However, in our view, the *Nicholson* case is distinguishable. In *Nicholson*, the accident which resulted in decedent's death was caused by a faulty construction procedure. Thus, the contractual limitation of liability applied. Conversely, in this case, a factual dispute exists whether the accident was caused by the negligent construction procedure employed by Seneca Steel or the negligence of Korda/Nemeth in authorizing the use of the Hilte Quick-bolts, as plaintiffs contend that the Hilte Quick-bolts were an inadequate

---

2. The parties agree that the contract at issue is the standard form contract issued by the American Institute of Architects ("AIA").

substitute for the originally specified anchor bolts and that the collapse of the structure was caused, at least in part, by these defective anchor bolts. *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 337, 28 OBR 400, 403, 504 N.E.2d 415, 419 (" * * * Generally, one who contracted in a specialized professional capacity to provide the design for a particular structure may be held to respond in damages for the foreseeable consequences of a failure to exercise reasonable care in the preparation of the design.").

Plaintiffs supported their argument in the trial court with the affidavit of a forensic engineer. In his affidavit, David L. Jacobson states:

"It is my opinion that the decision regarding the type of anchor bolt to be used as replacement anchor bolts, for the original anchor bolts, was the responsibility of Korda–Nemeth Engineering, Inc. (hereinafter 'KNE'). It is my opinion, to a reasonable degree of engineering certainty, that KNE was negligent in specifying the use of an expansion anchor bolt as a replacement bolt for some of the original anchor bolts in this project, and that the building collapse and death of Donald Clark [were] caused, in part, as a direct and proximate result of this negligence of KNE."

Even though Korda/Nemeth did not raise the issue in the trial court, on appeal to this court, Korda/Nemeth argues, for the first time in this case, that plaintiffs failed to offer any proof that Korda/Nemeth actually authorized the use of Hilte Quick-bolts in phase four of this project. The trial court did not address this issue in ruling on the motion for summary judgment, and the record contains no direct evidence whether the use of the Hilte Quick–Bolts in phase four was actually authorized by Korda/Nemeth.

In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 273–274, the Ohio Supreme Court recently set forth the following "firmly established" rules regarding summary judgment:

"[W]e hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, *the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied.* However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts

showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." (Emphasis added.)

In light of the *Dresher* standard, it would be inappropriate to affirm summary judgment on this record. In our view, Korda/Nemeth did not satisfy its initial burden of identifying the issue in the trial court or of affirmatively demonstrating plaintiffs' lack of proof on this key issue. It cannot simply be assumed, in absence of any evidence, that Korda/Nemeth did not authorize the use of Hilte Quick–bolts in phase four. There was no evidence before the trial court that the substitution of Hilte Quick-bolts was limited exclusively to phase one, and no evidence that the substitution would not have been considered a universal change in the design specifications.

In short, we hold that the trial court erred when it determined that Korda/Nemeth was entitled to judgment as a matter of law. Plaintiffs' first assignment of error is sustained.

In plaintiffs' second and third assignments of error, plaintiffs contend that the trial court erred by not allowing plaintiffs' counsel to conduct a voir dire of defendants' expert witness and by permitting defendants' expert witness to use a model to illustrate his testimony. Accordingly, we will consider plaintiffs' second and third assignments of error jointly.

During direct examination, defendants' engineering expert, Peter Korda, opined that the failure of Seneca Steel to properly cross-brace the structure caused the collapse which killed Donald Clark. In the professional opinion of Korda, the substitution of the Hilte Quick-bolts had absolutely nothing to do with the collapse of the structure. To illustrate the engineering principle underlying his opinions, Korda used two models consisting of plastic columns and beams which were joined together in the same configuration as the partially constructed steel frame of the HNB building. In one of the models, the columns were firmly affixed to the base and the structure was secured by a single wire. In the other model, the columns were not affixed to the base but the structure was secured by two wires, *i.e.,* "cross-bracing." The two models were otherwise identical. As Korda testified, he applied weight equally to each of the models. Eventually, the model which was not cross-braced collapsed while the other model remained standing.

Plaintiffs first argue that they should have been permitted to conduct a voir dire of this witness, outside the presence of the jury, to determine whether a proper foundation could be laid for the use of the models. Plaintiffs specifically requested a voir dire of the witness to determine whether the conditions of the "experiment" were substantially similar to those that existed on the date the HNB building collapsed. *Schweinfurth v. C.C.C. & St. Louis Ry. Co.* (1899), 60

Ohio St. 215, 54 N.E. 89. Defense counsel and defendants' expert witness responded by admitting that the models were significantly different from the HNB building. Indeed, it was conceded that the model was not built to scale, that the materials used were not meant to represent the relative strength of the materials used in the HNB building, and that the weight applied to the model was not intended to represent the relative amount of weight applied to the HNB building when it collapsed.

The trial court did not permit voir dire, but did indicate its willingness to give a limiting instruction to the jury. We find that the proposed voir dire was unnecessary given the admissions of defendants' expert witness regarding the intended use of the model. Thus, we perceive no prejudice to plaintiffs arising from the trial court's refusal to allow voir dire. However, the cosmetic similarities between the models used in the demonstration and the HNB building raises a question of unfair prejudice and confusion of the issues. See Evid.R. 403(A). More particularly, the demonstration raises the issue of whether the relevancy of the demonstration when used to illustrate the expert's testimony was substantially outweighed by the danger that the jury would mistakenly believe that the models were meant to represent the actual conditions which existed at the time of the collapse. We will not disturb the decision of the trial court on this question absent a clear showing of an abuse of discretion. See *State v. Allen* (1995), 73 Ohio St.3d 626, 653 N.E.2d 675; *Renfro v. Black* (1990), 52 Ohio St.3d 27, 556 N.E.2d 150.

Korda explained that the models were used to demonstrate his theory that a properly cross-braced structure that is not secured to its base will withstand greater vertical forces than an identical structure which is securely anchored. As stated above, defendants did not offer the demonstration as a scale model recreation of the actual collapse. Moreover, the trial court gave the following limiting instruction:

"[T]he [defendants] are not using this as a representation to try to duplicate the structure that's involved here. I want you to make sure you keep that in mind. That it's not to scale.

"It does not in any way represent the strength of steel or anything that was being used at this site. It's merely being used * * * so that this witness * * * can demonstrate to you some of the principles that he is talking about within his testimony at this point in time.

"So I want you to keep all of those things in mind when the witness is testifying and using this."

Given the limited purpose for which the demonstration was offered, the lack of a substantial similarity between the conditions of the demonstration and the

conditions that existed at the accident scene would not require exclusion of the demonstration. Indeed, the transcript reveals that the trial court was satisfied that there was little risk that the jury would mistakenly believe that the models were meant to represent the actual conditions which existed at the time of the collapse.[3] In short, the record does not clearly show an abuse of discretion by the trial court. *Allen* and *Black, supra.* Plaintiffs' second and third assignments of error are overruled.

In plaintiffs' fourth assignment of error, plaintiffs contend that the trial court abused its discretion in refusing to permit Dale Campbell to offer an expert opinion as to the cause of the collapse. Campbell testified as a fact witness in the case because he was the person operating the crane at the moment the HNB building collapsed. Plaintiffs also offered Campbell's testimony as an expert in the field of steel erection and attempted to elicit from Campbell his expert opinion as to the cause of the collapse of the HNB building. The trial court ruled that Campbell did not possess the necessary qualifications to offer an expert opinion of the cause of the collapse. Plaintiffs contend that the trial court abused its discretion in making this ruling. We disagree.

Evid.R. 702 provides in relevant part:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) *The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;*

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * * ” (Emphasis added.)

---

**3.** Following one of several objections to the use of the model, the trial court stated:

"MR. MILLER: Your Honor, we propose to go ahead with this illustration based upon this prop, if that's sufficient information.

"MR. GALLAGHER: I continue to object based upon the fact that there is no testimony as to whether or not the weights he's putting on this structure are in the same place as the weights that are put on the structure in question. There's no foundation as to whether or not the amount of weight he's putting on this structure is the same or more than the weight put on that structure in relation to these plastic pieces he's got.

"He has already admitted the plastic pieces are weaker than those, than the steel. He's admitted that they bend back and forth.

"THE COURT: Well, I think—

"MR. GALLAGHER: I continue to object strongly to it.

"THE COURT: I understand. I think as the witness has indicated, he is not using it as a replica, as a model, and I think the jury has been instructed of that and I think it understands it. You can proceed with your question."

■ Dale Campbell testified that he had owned Seneca Steel since 1988 and that he had been employed in the steel-erection business for the last thirty years. According to Campbell, he had been personally involved in the construction of more than eight hundred steel structures in his career and that twenty or thirty of these structures were similar to the HNB building which is involved in this litigation. Additionally, there was testimony that Dale Campbell had sole discretion to determine the methods, manner and sequencing of steel erection at this project.

There is no disagreement in this case that Dale Campbell possessed the necessary qualifications to testify as an expert in steel erection. Indeed, Campbell was permitted to offer his expert opinion that nothing his company did during the erection process could have caused the collapse of the structure; that cross-bracing was not normally required at the stage of construction when the building collapsed; and that the change in the sequencing of the project adversely affected the stability of the structure. The trial court refused, however, to allow Campbell to give his opinion as to the cause of the collapse of this particular steel structure. Plaintiffs submit that Campbell would have opined that the substitution of the Hilte Quick-bolts without his knowledge and the change in the sequencing of the project, combined with other factors, caused the collapse.

■ It has been held that an expert witness is not required to be the best witness on any particular subject. *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603. However, it is also true that a witness may be qualified to testify as an expert on one subject but may not be qualified to testify as an expert on another related subject. See, *e.g., Vistein v. Keeney* (1990), 71 Ohio App.3d 92, 99, 593 N.E.2d 52, 56–57 (A registered engineer who specialized in determining the cause of defects in buildings and other structures was not qualified to give an expert opinion as to the cause of a bridge collapse, since he was not familiar with the procedures for designing or constructing bridges.); *Scott v. Yates* (1994), 71 Ohio St.3d 219, 643 N.E.2d 105 (Although a police deputy was qualified to testify as an expert in accident investigation and offer an expert opinion on the point of impact, he was not qualified to offer an expert opinion on the cause of an accident due to his admitted lack of experience and training in accident reconstruction.). The determination whether a witness possesses the necessary knowledge, skill, experience, or training to testify as an expert in a given subject matter is left to the discretion of the trial court. *Yates, supra.*

Dale Campbell admitted that he was not familiar with the characteristics or properties of the anchor bolts used by the concrete subcontractors and that he relied on the expertise of the design engineers to provide him with an anchor bolt which would be sufficient to stabilized the structure. Campbell had no experience, skill or training in structural engineering, forensic engineering or accident

reconstruction, and he had never before been consulted to determine the cause of the collapse of a steel structure. Given Campbell's admitted lack of familiarity with the design characteristics of anchor bolts and his lack of training, education or experience in engineering or accident reconstruction, we are not convinced that the trial court acted unreasonably, arbitrarily, or unconscionably in determining that Campbell was not qualified to offer his opinion as to the cause of the collapse of the building.

Moreover, we note that plaintiffs' engineering expert was permitted to offer his expert opinion as to the cause of the collapse. Thus, the trial court's ruling concerning Dale Campbell's testimony did not prevent plaintiffs from offering expert testimony as to the cause of the accident. Plaintiffs' fourth assignment of error is overruled.

Having overruled plaintiffs' second, third and fourth assignments of error, but having sustained plaintiffs' first assignment of error, we hereby affirm the judgments of the Franklin County Court of Common Pleas in favor of defendants Northeast and Daimler Group, but we reverse the judgment in favor of Korda/Nemeth, and remand this case to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PEGGY BRYANT and LAZARUS, JJ., concur.