278 N.J. Super. 451 (1995)
651 A.2d 492
CIDALINA O. CARVALHO, EXECUTRIX OF THE ESTATE OF FRANCISCO F. CARVALHO, PLAINTIFF-APPELLANT,
v.
TOLL BROTHERS AND DEVELOPERS AND BERGMAN HATTON ENGINEERING ASSOCIATES, DEFENDANTS-RESPONDENTS/CROSS-APPELLANTS AND CROSS-RESPONDENTS, AND WEST WINDSOR TOWNSHIP, DEFENDANT, AND JUDE ENTERPRISES, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1994.
Decided January 12, 1995.
*454 Before Judges HAVEY, BROCHIN and CUFF.
Richard B. Gelade argued the cause for appellant (Mr. Gelade on the brief).
*455 Lawrence Berg argued the cause for respondent/cross-appellant and cross-respondent Toll Brothers & Developers (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Richard L. Goldstein and Mr. Berg on the brief).
Frederic J. Schragger argued the cause for respondent/cross-appellant and cross-respondent Bergman Hatton Engineering Associates (Mr. Schragger on the brief).
Colquhoun & Colquhoun, P.A., attorneys for third-party defendant Jude Enterprises (Robert F. Colquhoun, on the letter-brief).
The opinion of the court was delivered by HAVEY, J.A.D.
Plaintiff's decedent, Francisco F. Carvalho, while working in a trench on a sewer installation site, was crushed to death when the trench collapsed. The central issue raised by this appeal is whether the engineer who supervised the job on behalf of the owner and who had no contract obligation to inspect for safety hazards, nevertheless owed decedent a duty to take some reasonable action to prevent decedent's injury when the engineer has actual knowledge of the dangerous condition of the trench. We conclude that such a duty exists and therefore reverse the summary judgment order entered in favor of the engineer, defendant Bergman Hatton Engineering Associates (Bergman). On defendant Toll Brothers' cross-appeal, we reverse the summary judgment orders requiring it to indemnify Bergman for the wrongful death claim asserted by plaintiff.
Bergman, defendant West Windsor Township's engineer since 1981, prepared design plans on behalf of the Township for the construction of a sewer line as part of the Assunpink Basin Sewerage Facilities. The Township hired Toll Brothers as its general contractor to install the sewer line. A "Facility Agreement" between the Township and Toll Brothers provides that the sewer facilities were to be constructed by Toll Brothers in accordance with the plans prepared by Bergman. Under the agreement *456 Bergman would have a full-time representative at the site "to ensure that the Work of TOLL is being performed in accordance" with the plans, specifications and contract documents. The agreement defines Bergman's supervisory role at the job site, including its right to demand improvement in "the contractor's work or rate of progress." However, "neither compliance with such order nor failure of [the engineer] to issue such orders shall relieve the Contractor from his obligation to secure the degree of safety ... required by the contract. The Contractor alone shall be responsible for the safety, adequacy and efficiency of his plant, equipment and methods." The documents also incorporate by reference specifications of the New Jersey Construction Safety Code, N.J.A.C. 12:180, and regulations promulgated under the Occupational Safety and Health Act (OSHA), 29 U.S.C.A. §§ 651 to 678.
Under the agreement, Bergman reserves the right to inspect Toll Brothers' work and has the authority to reject it when it does not comply with the facility documents or plans and specifications. However, the agreement also provides that the engineer "shall not have control" over the construction means, methods, techniques, or "safety precautions" used by Toll Brothers in connection with the work. Further, Toll Brothers assumes sole responsibility for the construction means, methods and techniques, and for the "acts and omissions of its employees." It also agrees to "cause its employees, agents and subcontractors to cease the performance of the work at the direction of the Engineer."
Toll Brothers hired third-party defendant Jude Enterprises to perform the excavation work. Decedent, a Jude employee, was crushed to death when a thirteen-foot deep unshored trench collapsed at the job site. Bruce Stoneback, Bergman's site representative, was present at the site when the accident occurred. He testified at his deposition that he was aware trench boxes were routinely used at the project to protect workers from trench collapses. However, he also acknowledged that trench boxes were not being used on the date of the accident. He assumed that this *457 was so because such a device may have crushed a gas line and water main in the proximity of the trench. Stoneback had also observed water present in the general location of the trench that collapsed. According to Stoneback, the trench collapsed several times prior to the date of the accident. Approximately one week before the accident, Stoneback noted that the trench was unstable, water had pooled in the bottom of the trench, and the walls caved or slid onto the trench floor. He acknowledged that he knew an unshored trench of thirteen feet in depth could be dangerous and that he himself would not want to be in such a trench when it was in such a condition.
Plaintiff Cidalina Carvalho, decedent's wife, filed this wrongful death and survivorship action against Toll Brothers, Bergman and the Township. The complaint was dismissed against the Township because of plaintiff's noncompliance with the notice requirements under the New Jersey Tort Claims Act, N.J.S.A. 59:8-8. Bergman cross-claimed against Toll Brothers, and Toll Brothers third-partied Jude Enterprises. Plaintiff settled with Jude Enterprises and Toll Brothers.
Bergman moved for summary judgment, arguing that it owed no duty to decedent. The motion judge agreed, reasoning that although the engineer may have had actual knowledge of the dangerous nature of the thirteen-foot trench, its duty was defined and limited by the contract terms under which Toll Brothers, not Bergman, had the sole responsibility to make safety inspections and to provide the necessary safeguards to protect workmen from dangerous conditions at the job site. Therefore, the judge concluded, Bergman had no duty to warn plaintiff or the other job-site workmen of the unsafe condition in the trench.

I
To recover under a negligence theory, the defendant must first owe a duty to the plaintiff. Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 529, 538 A.2d 346 (1988). "The question of whether a duty exists is a matter of law properly *458 decided by the court, not the jury...." Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991). The question is one of fairness and policy that "`involves identifying, weighing, and balancing several factors  the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194, 638 A.2d 1288 (1994) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)). Although reasonable foreseeability of harm is essential to the creation of a duty, "not all foreseeable risks give rise to duties." Dunphy v. Gregor, 136 N.J. 99, 108, 642 A.2d 372 (1994). The ability to foresee injury to a potential plaintiff "does not in itself establish the existence of a duty"; nevertheless, it is a crucial element in determining whether imposition of a duty is appropriate. Carter Lincoln-Mercury, Inc., 135 N.J. at 194, 638 A.2d 1288. "Once the foreseeability of an injured party is established, we must decide whether considerations of fairness and policy warrant the imposition of a duty." Carter Lincoln-Mercury, Inc., 135 N.J. at 194-95, 638 A.2d 1288.
We have found no New Jersey case deciding whether or not an engineer, contractually obligated to supervise a construction site on behalf of the owner, owes a duty to job-site workmen to protect them from injuries resulting from unsafe conditions. We addressed the issue of an engineer's duty in a different setting in Sykes v. Propane Power Corp., 224 N.J. Super. 686, 694, 541 A.2d 271 (App.Div. 1988), where a chemical recovery plant worker was killed when the facility exploded. Id. at 690, 541 A.2d 271. The engineer, who prepared plans to upgrade an industrial plant in order to meet State environmental regulations, was sued based on negligence "by placing his seal upon documents reflecting an unsafe and negligently developed chemical processing system." Id. at 692, 541 A.2d 271. We held that:
Although all engineers have a professional obligation to see that the work they do is accurate and in conformance with accepted standards of care, the duty to foresee and prevent a particular risk of harm from materializing should be *459 commensurate with the degree of responsibility which the engineer has agreed to undertake.

[Id. at 694, 541 A.2d 271 (emphasis added).]
The engineer in Sykes was retained to prepare a basic geographical layout of the existing facilities; it was not asked to evaluate the safety of the plant. Ibid. Concluding that the engineer owed no duty to the worker, we held:
Under the circumstances, it would go against all settled principles of tort law and considerations of fairness and policy to visit liability upon [the engineer] for any failure in the plant or its operating procedures simply because he affixed his seal to several generalized drawings depicting the allegedly defective components involved.
[Id. at 694, 541 A.2d 271.]
In other jurisdictions, there is a split of authority as to whether an engineer or architect owes a duty of care to job-site workers. Generally, the inquiry focuses on the extent to which the professional assumes a supervisory role under relevant provisions of the construction contract. See e.g., Frank D. Wagner, Annotation, Liability to One Injured in Course of Construction, Based Upon Architect's Alleged Failure to Carry Out Supervisory Responsibilities, 59 A.L.R.3d 869, 875-78 (1974), and cases cited therein. For example, in Smith v. Inter-County Tel. Co., 559 S.W.2d 518, 526 (Mo. 1977), the Missouri Supreme Court found that an engineering firm inspecting the material and workmanship at a telephone company excavation did not have sufficient control over operations to give rise to a duty of care to job-site employees. The Court reversed a judgment against the engineer because there was no agreement between the contractor and the engineer, the engineer did not control the contractor's employees, and no engineer representative was at the job site when plaintiff was injured. Ibid. See also, Romero v. Parkhill, Smith & Cooper, Inc., 881 S.W.2d 522, 526 (Tx.Ct.App. 1994) (although engineer's contract directed it to make periodic visits to job site, no provision gave engineer control over manner in which contractor and subcontractors performed their work and thus engineer owed no duty to subcontractor's employee who fell through roof during construction of the sewerage treatment plant).
*460 Similarly, in Hanna v. Huer, Johns, Neel, Rivers & Webb, 233 Kan. 206, 662 P.2d 243 (1983), the Supreme Court of Kansas held that an architect who prepared plans and specifications for the erection of a building on behalf of the owner, and who was responsible for general administration of the construction contract, was not responsible for the safety of workmen on the job site. Id., 662 P.2d at 247. In so finding, the Court relied in part upon an express clause in the contract that absolved the architect from responsibility for construction methods or safety precautions. Id. at 248-49. According to the Court, the architect's duty was simply "to see that his employer gets a finished product which ... conforms to the plans and specifications." Id. at 252. Cf. Caldwell v. Bechtel, Inc., 631 F.2d 989, 1001-02 (D.C. Cir.1980) (engineer owed duty to job-site employees because engineer was responsible to ensure compliance with a safety manual and had assumed the obligation to ensure that contractors on the job obeyed safety requirements). See also, Erhart v. Hummonds, 232 Ark. 133, 334 S.W.2d 869, 872 (1960) (architect who had contractual authority to stop work and supervise construction owed a duty to workmen at the site to assure compliance with pertinent safety provisions in the contract).
Nevertheless, it is clear that an engineer or architect may owe a duty, despite the absence of any contractual obligations concerning safety, when the professional has actual knowledge of a dangerous condition to which the job-site workmen are exposed. For example, despite the Court's finding in Hanna that the architect owed no duty to the workmen because it assumed no responsibilities for safety procedures under the contract, it observed that "[w]e agree with plaintiffs' contentions that if [the architect] had actual knowledge of unsafe practices they should have taken some action." 662 P.2d at 253. The Court reasoned that "[a]s a professional, an architect cannot stand idly by with actual knowledge of unsafe safety practices on the jobsite and take no steps to advise or warn the owner or contractor." Id. at 254.
*461 Consistent with that expression, the same Kansas Supreme Court later held that although a building contract did not specifically place upon an engineer the responsibility for the safety of the workmen at the job site, the engineer nevertheless owed a duty "to take some reasonable action to prevent injury" because its jobsite supervisor had actual knowledge that safety standards requiring shoring on trenching operations were not being followed by the contractor at the time of the accident. Balagna v. Shawnee Cty., 233 Kan. 1068, 668 P.2d 157, 164 (1983). In that case the engineer's supervisor knew that an unshored ten-foot trench was unsafe and violated government standards and acknowledged "that a man being in an unshored trench at that depth was in a dangerous situation." Id., 668 P.2d at 165. When the supervisor was asked why he did not tell the workman [decedent Balagna] who was in the trench to get out until it could be shored, his response was "that man's boss was standing right there with me. It is not for me to tell him what to do." Ibid.
In finding that the engineer owed a duty "to take some reasonable action to prevent injury," the Balagna Court noted not only that the supervisor knew of the dangerous condition, but also that the contract documents, which covered safety precautions, had been prepared by the engineer and thus the engineer could not deny it had knowledge of the importance of safety precautions during excavation of the trench. Id. at 164. The Court also implicitly rejected the engineer's argument that its supervisor would have exceeded his authority had he made efforts to notify the workmen in the trench of the unsafe condition. On the evidence before it, the Court found a "legitimate issue of fact" as to whether the engineer's supervisor "acted reasonably under the circumstances to prevent injury to [the decedent] as an employee of the contractor." Id. at 166.
Applying the above-defined principles to the facts before us, we are satisfied that Bergman owed a duty to "take some reasonable action to prevent injury" to workers exposed to the dangerous thirteen-foot deep trench. We have no quarrel with *462 the motion judge's determination that the provisions in the contract between the Township and Toll Brothers did not specifically place upon Bergman the responsibility for the safety of the workmen on the job site. It does not follow, however, that the absence of a contractual provision imposing such responsibility means that the engineer need not exercise reasonable care to take some action when unique circumstances present at the job site demand such action. This is not a breach of contract case; plaintiff asserts a breach of duty of reasonable care on the part of the engineer. Contractual duties are imposed by agreement between the parties; a duty of care owed by an engineer under tort law is based primarily on social policy. Caldwell, 631 F.2d at 997. The engineer may be subject to liability if its failure to exercise reasonable care under the circumstances increases the risk of harm to a third person. Restatement (Second) of Torts § 324A (1965).
Bergman had the authority to stop the job if it was not being performed by Toll Brothers in accordance with the plans and specifications. Bergman placed its representative, Stoneback, at the site as a full-time inspector to ensure Toll Brothers' compliance with the plans and specifications. Of most significance is that Stoneback was aware of water present in the trench and had seen the trench collapse several times prior to the date of the accident. He knew that the trench floor was unstable and water was abundant several days before the accident. With his knowledge of the unsafe nature of the trench, it was reasonably foreseeable to Stoneback (and therefore to Bergman) that a workman may be injured or killed unless Bergman and its representatives took some other reasonable step to prevent the injury. Fairness and policy dictate imposition of a duty upon the engineer since, as a professional, he or she should not "stand idly by with actual knowledge of unsafe safety practices on the jobsite and take no steps" to prevent injury to the workers at risk. Hanna, 662 P.2d at 254. There is, of course, a fact issue as to whether Stoneback and Bergman acted reasonably under all the circumstances. Balagna, *463 668 P.2d at 166. We therefore reverse the summary judgment and remand for further proceedings.

II
On its cross-appeal Toll Brothers contends that the motion judge erred in finding that the contract documents required Toll Brothers to defend and indemnify Bergman against plaintiff's claim. Bergman also cross-appeals, arguing that the judge erred in holding that Bergman must first exhaust its coverage under its own general liability policy before Toll Brothers' obligation to indemnify takes effect.[1]
Paragraph 15 of the Township/Toll Brothers' contract has the following pertinent clauses:
b. Subject to the provisions of Section 14(d)(2) hereof, TOLL agrees to indemnify and hold TOWNSHIP harmless from any and all responsibility or damages, either of personal injury or property or to the Work, arising out of the construction of the Work and against any judgments obtained against TOWNSHIP with respect thereto and TOLL agrees to provide a defense, at its cost, for TOWNSHIP in any action filed against it with respect thereto.
c. Prior to commencement of the Work, TOLL shall submit the required insurance certificates to Engineer and TOWNSHIP attorney for review and transmittal to TOWNSHIP. All such certifications shall name TOWNSHIP and Engineer as additional insureds, and shall provide that TOLL'S insurance carrier shall give TOWNSHIP at least thirty (30) days written notice prior to any change or cancellation of coverage.
[(Emphasis added).]
Toll Brothers failed to have Bergman named as an additional insured under its general liability policy issued by American Mutual Liability Insurance Company.
On Bergman's summary judgment motion seeking indemnification on the strength of these provisions, the motion judge determined that subparagraphs b. and c., read together, required Toll Brothers to indemnify Bergman "by insurance, and having failed *464 to do that, it must provide the relief itself." The judge therefore ordered Toll Brothers to defend and indemnify Bergman for the wrongful death claim asserted by plaintiff.
Toll Brothers thereafter moved for reconsideration upon learning that its insurance carrier, American Mutual, had been declared insolvent and been placed in liquidation in the State of Pennsylvania. The Pennsylvania Insurance Guarantee Association (PIGA) assumed the obligations of American Mutual and was deemed Toll Brothers' insurance carrier. See 40 P.S. § 1701.201(b)(1)(ii). Applying various provisions of Pennsylvania's insolvency statute limiting an insured's claim against PIGA, the motion judge determined that Bergman was first required to exhaust its own liability insurance coverage before a claim against PIGA could be made. The judge also determined that, pursuant to the statute, the most PIGA would be required to pay was $300,000. He therefore modified his original indemnity order to provide that Bergman must exhaust its own policy up to $300,000 before Toll Brothers was obligated to indemnify Bergman on plaintiff's claim. Toll Brothers argues that the indemnity provisions do not expressly provide that it will indemnify Bergman against claims resulting from Bergman's own conduct. We agree.[2] As the Supreme Court stated in Ramos v. Browning Ferris Indus., 103 N.J. 177, 191, 510 A.2d 1152 (1986):
Indemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally. Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117, 121 [164 A.2d 69] (App.Div. 1960); Longi v. Raymond-Commerce Corp., 34 N.J. Super. 593, 603 [113 A.2d 69] (App.Div. 1955). When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee. See Longi v. Raymond-Commerce Corp., supra, 34 N.J. Super. at 603 [113 A.2d 69]; Huck v. Gabriel Realty, 136 N.J. Super. 468, 475 [346 A.2d 628] (Law Div. 1975). Thus, a contract will not be construed to indemnify the indemnitee *465 against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms.
See also, Meder v. Resorts Int'l Hotel, 240 N.J. Super. 470, 478-79, 573 A.2d 922 (App.Div. 1989), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990); Tryanowski v. Lodi Bd. of Educ., 274 N.J. Super. 265, 274, 643 A.2d 1057 (Law Div. 1994).
For example, in Ramos, defendant Browning Ferris Industries (BFI) had a service agreement to furnish solid waste compactors and containers to a customer. The agreement included an indemnity clause whereby the customer would "defend, indemnify and hold harmless" BFI for any claims for injuries "resulting from or arising in any manner out of the [c]ustomer's use, operation or possession of the equipment furnished under this [a]greement." 103 N.J. at 182, 510 A.2d 1152. In the course of removing containers from the customer's premises, BFI gouged ruts in the ground. A worker of the customer was injured when he tripped over a rut. Ibid. The Supreme Court held that the accident did not activate the customer's duty to indemnify because the injuries did not arise from the customer's "use, operation or possession" of BFI's equipment. Id. at 192, 510 A.2d 1152. The Court also found the indemnification clause ambiguous whether the customer agreed to indemnify BFI's own acts of negligence, and therefore construed the clause against the indemnitee. Id. at 193, 510 A.2d 1152.
Here, subparagraph b. of paragraph 15 of the contract states that Toll Brothers agrees to indemnify and hold the Township harmless "from any and all responsibility or damages ... arising out of the construction of the Work and against any judgments obtained against the TOWNSHIP with respect thereto...." By the very terms of the clause, Toll Brothers agrees to indemnify the Township, not Bergman. Moreover, the clause is sufficiently ambiguous to permit a reading that Toll Brothers is agreeing to indemnify the Township only for Toll Brothers' own negligence in the carrying out of its construction duties under the contract. At most, it suggests an intention to indemnify the *466 Township for its passive liability as a property owner arising from the active wrongdoing of another. In any event, we will not construe the clause as stating that Toll Brothers agrees to indemnify Bergman against losses resulting from Bergman's own conduct since that intention is neither expressed in unequivocal terms, Ramos, 103 N.J. at 191, 510 A.2d 1152, nor reasonably implied, even if we read subparagraphs b. and c. of paragraph 15 together.
However, Toll Brothers also agreed under subparagraph c. to name the Township "and Engineer [Bergman] as additional insureds" under Toll Brother's general liability policy. Therefore, Bergman was a third-party beneficiary under the contract, and Toll Brothers breached the contract by failing to name Bergman as an additional insured. Bergman was therefore entitled to recover its loss sustained by reason of the breach, that is, the amount of coverage that would have been available to it under the policy if Toll Brothers had complied with its contract obligation. See Cromartie v. Carteret Savings & Loan, 277 N.J. Super. 88, 98-99, 649 A.2d 76 (App.Div. 1994); Robinson v. Janay, 105 N.J. Super. 585, 591, 253 A.2d 816 (App.Div. 1969), certif. denied, 54 N.J. 508, 257 A.2d 107 (1969).
If Toll Brothers had complied with subparagraph c., Bergman would have been named as an additional insured under Toll Brothers' liability policy with American Mutual. As stated, American Mutual was declared insolvent in Pennsylvania. Thus, Bergman's entitlement to coverage became subject to the provisions of the pertinent Pennsylvania insolvency statute.
Under Pennsylvania's Insurance Guarantee Act, 40 P.S. § 1701.101 to .605, PIGA is deemed to be an insurer and "is placed in the stead of the insolvent insurer, with all of that insurer's rights and duties and obligations." Donegal Mutual Ins. Co. v. Long, 528 Pa. 295, 597 A.2d 1124, 1127 (1991). The Act provides that PIGA is "obligated to make payment to the extent of the covered claims of an insolvent insurer ... but such obligation shall include only that amount of each covered claim" which does not *467 exceed $300,000. 40 P.S. § 1701.201(b)(1)(i). A "covered claim" means an unpaid claim which arises under a property and casualty insurance policy of an insolvent insurer. 40 P.S. at § 1701.103(5)(a). PIGA's obligation to pay a covered claim is also subject to the following provision:
Non-duplication of recovery
(a) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.
[40 P.S. at § 1701.503(a).]
Because of this nonduplication of recovery provision and the $300,000 outer limit on claims against PIGA, the motion judge reasoned that Bergman was obligated to exhaust its own liability policy up to $300,000 before it could seek what the judge described as "indemnity" against Toll Brothers.
However, if Bergman had been named as an additional insured under the American Mutual policy, its sole remedy would have been to seek recovery against PIGA under Pennsylvania law. It would have had a "covered claim" against PIGA because it was entitled to a defense and indemnity from the insolvent carrier, American Mutual. 40 P.S. at § 1701.103(5)(a). The impediment placed upon Bergman was that the Association's own limitations of liability apply rather than those of the insolvent insurer. Donegal, 597 A.2d at 1127.[3] Bergman's claim, therefore, against PIGA would have been limited to $300,000, 40 P.S. § 1701.201(b)(1)(i), and since it is undisputed that Bergman has a "claim" against its own insurer for indemnification, it must first "exhaust [its] right under such policy" before seeking recovery against PIGA. Id. at § 1701.503(a). Pending exhaustion of its own policy, Bergman had no remedy against PIGA. We infer from the record that Bergman's *468 own liability policy exceeded $300,000, and therefore it suffered no loss as a result of Toll Brothers' breach in failing to name it as an additional insured under its insolvent carrier's liability policy.[4]
Bergman nevertheless urges that the "non-duplication of recovery" clause, 40 P.S. § 1701.503(a), applies only to claims against PIGA, whereas here Bergman's claim is against Toll Brothers personally to provide indemnification and insurance coverage on Bergman's behalf. We disagree. We have already concluded that Toll Brothers owed Bergman no duty to indemnify. The measure of Bergman's damages for Toll Brothers' breach of contract is the amount of coverage that would have been available to Bergman had Toll Brothers complied with its obligation to name Bergman as an additional insured. Once PIGA assumed the obligations of American Mutual, Bergman's claim became subject to PIGA's statutory limitations. PIGA was created to "give a measure of protection to policyholders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance." Bethea v. Forbes, 519 Pa. 422, 548 A.2d 1215, 1216 (1988) (emphasis added). See also, 40 P.S. § 1701.102(1) (purpose of the act is to "provide a means for the payment of covered claims ... and to avoid financial loss to ... policyholders as a result of the insolvency of an insurer"). It was not the fault of Toll Brothers that American Mutual became insolvent. To accept Bergman's argument would ignore the statutory limitations and would allow full indemnification against Toll Brothers, despite the fact that the agreement provides no such blanket protection.
Reversed and remanded for further proceedings.
NOTES
[1] Under the Toll Brothers' contract with its subcontractor, Jude Enterprises, Jude agreed to indemnify Toll Brothers. The motion judge granted Toll Brothers summary judgment against Jude, requiring Jude to provide a defense to and indemnify Toll Brothers. No appeal has been taken from the entry of that order.
[2] Toll Brothers also argues that Bergman's claim for indemnification is barred by the Statute of Frauds, N.J.S.A. 25:1-5(b), because the "Facility Agreement" containing the indemnification clause was not executed until after decedent's accident. We need not address the issue in view of our finding that, as a matter of law, Bergman is not entitled to indemnification.
[3] For example, although American Mutual's policy may have been issued in an amount substantially in excess of $300,000, that coverage is deemed reduced to $300,000, the statutory limitation provided under the Pennsylvania Act. See Donegal, 597 A.2d at 1127 n. 13.
[4] We have interpreted the "non-duplication of recovery" clause under the Pennsylvania statute solely for the purpose of resolving the narrow damage issue before us.