691 A.2d 826

SPENCER VAN MAUSSNER AND COLLEEN MAUSSNER, HIS WIFE, PLAINTIFFS–APPELLANTS, v. ATLANTIC CITY COUNTRY CLUB, INC., JAMES FRASER, INDIVIDUALLY AND/OR TRADING AS ATLANTIC CITY COUNTRY CLUB, DOUGLAS FRASER, INDIVIDUALLY AND/OR TRADING AS ATLANTIC CITY COUNTRY CLUB, LAURIE FRASER, INDIVIDUALLY AND/OR TRADING AS ATLANTIC CITY COUNTRY CLUB, ATLANTIC CITY COUNTRY CLUB, LTD., AND MEADOWLINKS CORPORATION, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1997—Decided April 4, 1997.

Before Judges KLEINER and COBURN.

*Virginia A. Pallotto* argued the cause for appellants (*Budd, Larner, Gross, Rosenbaum, Greenberg & Sade,* attorneys; *Ms. Pallotto,* of counsel and on the brief).

*Richard D. Madden* argued the cause for respondents (*Law Offices of Joel Feldscher,* attorneys; *Mr. Madden,* of counsel; *Kathleen A. Alexander,* on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

This case is one of first impression in New Jersey. · The issue raised is whether golf course operators owe a duty of care to their patrons to protect them from lightning strikes. Plaintiffs Spencer Maussner and Colleen Maussner appeal from the entry of an order granting summary judgment to defendants. In their appeal, plaintiffs contend that the trial court erred in summarily concluding that the owners and operators of a golf course owed no duty to golfers to protect them from lightning strikes. According to plaintiffs, a lightning strike on a golf course is a foreseeable risk that must be addressed by the owners of the course where various means of protection are feasible. Plaintiffs maintain that the dismissal of this case prior to the completion of crucial discovery denied them the opportunity to ascertain who bore the responsibil-

ity for failing to implement proper safety procedures at defendant's golf club.

We need not consider, under the circumstances of this case, whether all golf courses have an affirmative duty to protect their patrons from lightning strikes. We find, however, that where a golf course has taken steps to protect its patrons from lightning strikes, a duty of reasonable care arises to take these steps correctly under the circumstances.

Finding that there is a triable issue as to whether defendant Atlantic City Country Club properly implemented its safety procedures, we reverse and remand to the trial court for proceedings not inconsistent with this opinion.

I

A.

At approximately 7:30 a.m. on Sunday, March 28, 1993, plaintiff Spencer Van Maussner,[1] a longstanding member of the Atlantic City Country Club (Club), arrived at the Club with his friends Michael McHugh, Robert Dusz, and Peter Costanzo. The foursome regularly played golf together on Sunday mornings. Although a snowstorm had been predicted for that morning, the sportsmen were not deterred from pursuing their scheduled golf match.

The sky that morning was overcast with misty conditions, and it was drizzling rain by the time the group began to play. At approximately 8:00 a.m., the Club's starter [2] directed the foursome

---

[1] Hereafter, all references to "plaintiff" in the singular will be to plaintiff Spencer Van Maussner.

[2] The "starter" is the person who tells the golfers when to start playing. His function is mainly to assure that golfers begin play at regular intervals. The starter will often advise players of any special rules that they need to follow on any particular day.

to begin play at the tenth hole.[3]  As the group played their first two holes, the tenth and eleventh, the drizzle turned into a downpour, which subsided as they teed off at the twelfth hole. After hitting his approach shot to the twelfth green, McHugh noticed a lightning bolt, and the four players and their two caddies proceeded along the fairway intending to seek refuge at the clubhouse, which was approximately one half mile away.  There were no man-made shelters along this route.  While walking, plaintiff put up his umbrella to avoid the rain.

On route to the clubhouse, the group crossed onto the seventh fairway.  Walking on the seventh fairway, McHugh and Dusz were about fifteen yards behind plaintiff and Costanzo.  Suddenly there was a tremendous noise, and McHugh watched as a lightning bolt struck plaintiff, causing him substantial injuries.  Both plaintiff and Costanzo fell to the ground.  Dusz immediately went for help at the clubhouse, which was approximately 325 yards away, while McHugh remained behind to assist his friends.  One caddie was sent to the nearby police station to obtain additional assistance.  After ascertaining that Costanzo was stable, McHugh administered CPR to plaintiff until the police and the medics arrived.  According to McHugh, the Club caddie master and Club pro arrived at about the same time as the police.  During this time, lightning continued to appear in the sky.

### B.

Plaintiff filed a complaint in the Superior Court, Law Division, Camden County, seeking damages for the injuries that he sustained in the above incident at the Atlantic City Country Club. The named defendants were the corporate entity itself; Douglas Fraser and James Fraser, the sole shareholders; Laurie Fraser, James Fraser's wife; and two other entities no longer in exis-

---

[3] It is not uncommon at golf courses for a player to begin play on the "back nine."  This is especially so when inclement weather conditions render a particular set of nine holes in better condition than another.

tence. The various defendants filed a timely answer to plaintiff's complaint, raising, *inter alia,* the defenses that they were under no duty to protect plaintiff from a lightning strike and that plaintiff's injuries were the result of an act of God.

Defendants moved for summary judgment asserting that plaintiff had not "met his burden of establishing that defendants created or maintained a dangerous condition on the golf course." According to their moving papers, defendant: [4]

> [U]sed reasonable care to make its premises safe for golfers. It monitored the weather channel and was in constant communication with the weather station. Signs were posted at the Country Club instructing members of its evacuation plan and how to proceed if inclement weather struck during play.

Defendant also argued that it was entitled to summary judgment because "[p]laintiff has not met its burden of establishing that a foreseeable risk was the proximate cause of his injuries."

Accompanying its motion for summary judgment, defendant attached its answers to plaintiff's interrogatories. One such answer claimed that it had "no notice of [the lightning storm], however this defendant did have an effective evacuation plan which was put into effect immediately upon notice of a lightning storm." [5] This evacuation plan apparently consisted of the golf pro and the pro shop manager getting into golf carts, driving onto the course to locate golfers, and making sure that all the golfers vacated the course.

According to defendant, Club management generally monitored the weather by listening to the weather advisory channel and placing calls to the Naval Aviation Facilities Experimental Center (NAFEC). The Club consulted the National Weather Service on the morning of the incident and, although inclement weather was predicted, there were no warnings that lightning was possible.

---

[4] To avoid confusion, "defendant" refers to all of the defendants in the action.

[5] There is no evidence in the record that this "evacuation plan" had been reduced to writing or posted anywhere at the Club.

The Club did not possess any equipment for detecting lightning, had not installed any audible warning devices, nor had they erected any shelters on the course.  Club members were warned about the general risks of lightning by a notice from Don Siok, the Club golf pro, and a United States Golf Association (USGA) poster, which were both posted in the locker room.  The notice from Siok advises golfers that:

> WEATHER CONDITIONS SOMETIMES NECESSITATE OUR GOLF COURSE EVACUATION PLAN TO BE IMPLEMENTED.
>
> WHEN AUTHORIZED PERSONNEL ADVISE YOU TO COME IN OFF THE COURSE, IT IS IMPERATIVE THAT YOU DO SO.
>
> OUR WEATHER MONITORING SYSTEM (NAFEC AND WEATHER ADVISORY CHANNEL) ADVISES U.S. OF DANGEROUS ELEMENTS IN THE AREA AND GIVES U.S. TIME TO CLEAR THE COURSE TO INSURE YOUR SAFE EVACUATION.
>
> THE U.S.G.A. RECOMMENDS YOU REACT IMMEDIATELY TO A DANGEROUS SITUATION AND TO SEEK SHELTER IF YOU FEEL DANGER FROM LIGHTING (sic) OR STORM IS IMMINENT.

In a responding certification, plaintiff claimed that these notices were not placed in the locker room until after he was struck by lightning.

As described by the Club, their evacuation plan, which entailed Club employees retrieving golfers on the course at the first notice of thunder or lightning, had been in effect for approximately forty years.  Defendant also maintained that golfers were encouraged to retreat to nearby private homes in the event of a severe storm. Plaintiff and his friends, in response certifications, denied any knowledge that they would be welcome at these homes.[6]  Nonetheless, according to defendant, one caddie did make this suggestion while the golfers were walking back to the clubhouse.  The golfers apparently rejected the idea.  Plaintiff, however, disputes this contention.

---

[6] It is unclear from the record whether the surrounding houses are on golf course property or whether they are independently-owned and outside of the perimeters of the golf course.

## C.

On March 19, 1996, plaintiff filed a brief in opposition to summary judgment and also filed a cross-motion to compel further discovery. On March 25, 1996, defendant cross-moved to compel discovery.

Accompanying plaintiff's brief in opposition to defendant's motion for summary judgment were the following: plaintiff's affidavit; a statement by Michael McHugh; and a "preliminary report" written by Henry A. Berger, CLP, a recreation and sports consultant, retained by plaintiff as an expert.

In plaintiff's affidavit, he opined that if the Club's evacuation plan worked as the Club stated that it did, the Club employees would have arrived earlier than they did. Plaintiff also disputed the claim that "everyone" knew that there were private houses along the course at which golfers would be welcome in the case of inclement weather. According to plaintiff, "[n]o one ever told me, or anyone else that I am aware of . . . prior to the incident, or for that matter afterwards, that their home, or any other neighboring home was open to golfers."

Plaintiff also stated in his affidavit that the Club "had no shelter anywhere on the course at the time of this incident, other than the clubhouse. . . . The 18 hole golf course had no intermediate shelters at the time of this incident." [7] Plaintiff also disputed defendant's assertion that the warning posters were posted at the club prior to the incident, claiming that they were "placed in the locker room *after* I was struck by lightning." Plaintiff also stated that other golf courses that he had played in the area have shelters along the course and siren or horn systems for warning golfers of a change in the weather.

According to Berger, the lightning was a "dangerous condition, and the design, management and maintenance of the Country

---

[7] Plaintiff also pointed out that subsequent to the incident defendant erected a shelter, a bathroom, on the 12th hole.

Club created and exposed [plaintiff] to the risk of being struck by lightning." According to Berger, "Weather Service personnel had the technology to foresee those conditions that would have resulted in storm fronts producing lightning." In other words, if the proper weather monitoring was used, this accident could have been avoided. Berger further stated:

> [T]here was technology available (Sky Scan) in 1993 to the Atlantic City Country Club that would have enabled personnel to detect lightning up to as much as a forty (40) mile radius of the Country Club. This technology was available at a reasonable, minimal investment to the Country Club, was portable and would have provided more time to institute an evacuation plan for golfers ... preventing the chance of someone being struck by lightning.

Berger discussed the placement of shelters on the golf course, stating that "[c]ommon practice in golf course design, management and maintenance is to provide shelters in strategic locations on the golf course." The reason for this, according to Berger, is to provide shelter for the golfers and protect golfers from dangerous weather conditions.

Berger opined that, based on the information available to him for the purpose of making his preliminary report, the evacuation plan utilized by the Club was inadequate, as evidenced by the period of time that it took the golf pro to find the golfers, and that the Club should have had a better system for warning the golfers of the need to evacuate the golf course by use of an audible signal.

Because of the preliminary nature of Berger's report, he reserved the right to change his opinion if further discovery so dictated. In sum, Berger found that the golf course was unsafe for golfers because the Club: (1) did not use available lightning detection equipment; (2) did not make proper use of various weather reporting services; (3) did not provide shelter at convenient spots throughout the course; (4) did not have an effective evacuation plan; and (5) did not adequately warn golfers of the hazards of lightning. Berger concluded that "[b]ut for these failures, this incident and the serious injuries sustained by Spencer Van Maussner on March 28, 1993, were preventable."

## D.

Immediately following oral argument on all pending motions, the motion judge entered an order granting defendants' motion for summary judgment and dismissing plaintiff's complaint.[8] In his decision on the summary judgment motion, the motion judge stated:

> I don't find, in any of the caselaw, any duty on the part of a country club to protect against acts of God. The storm, or the lightning portion of the storm, at least, appears to have been unanticipated. Whether it was or not, when the first bolt of lightning struck, it was equally visible to [plaintiff] as it was to the pro or assistant pro ... back in the shop, and he chose to expose himself by walking across the open fairways heading back to the pro shop.

The judge also found that the golfers should have taken refuge in the houses along the fairways or in a grove of trees or "got down as close to the ground as possible, put himself in a ball position if he was concerned about being struck by lightning." The judge indicated that he did not "see that anything that the country club did, even if it might be considered negligent or less than the optimum ... caused this injury to the plaintiff." The judge found that "the proximate cause was, first of all, an act of God, the lightning, and secondly, his own activities in exposing himself to the possibility of being struck by lightning."

## II

Plaintiff seeks judicial recognition of a duty to protect golfers from lightning strikes that they contend is owed to business invitees of golf courses. Such a duty has not been recognized in any jurisdiction. Specifically, this duty would obligate the Club and other golfing establishments to take affirmative measures in an effort to forestall injurious lightning strikes.

According to plaintiff, these affirmative measures would include one or more of the following: (1) using available lightning detection equipment; (2) using of various weather reporting services;

---

[8] Two additional orders were signed by the judge that same day denying the parties' respective discovery motions.

(3) placing lightning-proof shelters at convenient spots throughout the course; (4) maintaining an effective evacuation plan; and (5) posting warnings regarding the hazards of lightning. An analysis of plaintiff's claim leads to discussions of the duty of care, premises liability, and the "act of God" defense.

### A.

As noted, there is no New Jersey caselaw that addresses the issue of whether a golf course owes its patrons a duty of care to protect them from lightning strikes. Cases from other jurisdictions are somewhat instructive on this issue.

In *Hames v. State of Tennessee,* 808 *S.W.*2d 41 (Tenn.1991), the State of Tennessee appealed from a judgment entered by an intermediate appellate court awarding $300,000 to the widow of an individual killed by lightning while golfing on a state-run golf course. The decedent was struck by lightning during a thunderstorm that moved over the golf course approximately twenty-five minutes after plaintiff began to play. There were "no signs or warning devices informing players what to do in case of violent weather," nor were there any weather shelters on the golf course. *Id.* at 42.

Plaintiff's theory in *Hames* was that, "although lightning is generally regarded as an act of God, the death was the result of the State's negligence in failing to erect lightning proof shelters or maintaining a warning system to vacate the golf course during electrical storms." *Id.* at 43. After a trial before a commissioner,[9] the plaintiff's claim was dismissed on the grounds that: (1) the State had not negligently created or maintained a dangerous condition by failing to erect lightning-proof shelters; (2) there was no evidence of an industry standard requiring a policy of clearing

---

[9] As this was a claim against the State of Tennessee, it was apparently governed by that state's equivalent to our Tort Claims Act and, consequently, the case was heard by a commissioner of claims rather than a jury. *Hames, supra,* 808 *S.W.*2d at 42–43.

the course during storms; (3) the absence of such a policy did not create a dangerous condition; and (4) the absence of signs concerning lightning did not create a dangerous condition. *Ibid.*

The Tennessee Court of Appeals reversed the dismissal and awarded plaintiff the maximum award permitted under that state's statutory scheme, $300,000, concluding that the golf course had created or maintained a dangerous condition by not adhering to the rules of a golfing association regarding policies for lightning warning and by failing to provide lightning-proof shelters. *Id.* at 43–44.

On appeal, the Tennessee Supreme Court reversed the appellate court's determination and dismissed the complaint. In so doing, the Supreme Court relied in large measure on an earlier appellate court decision, *Davis v. Country Club, Inc.,* 53 *Tenn.App.* 130, 381 *S.W.2d* 308 (1963), in which the court affirmed a trial judge's entry of judgment in favor of a country club and against a plaintiff who sought damages after being hit by lightning while seeking refuge in a non-lightning-proof weather shelter. *Id.,* 381 *S.W.2d* at 312. After concluding that lightning was an act of God and recovery therefore required a showing of concurrent negligence on the part of defendant, the *Davis* court found that "the danger of the shelter being struck by lightning was so remote as to be beyond the requirement of due care.... Bare possibility is not sufficient." *Id.* at 311. As such, the plaintiff's injuries could not be deemed to have been caused by any negligence of the defendant. *Ibid.*

Relying on that analysis, the *Hames* court found that plaintiff could not recover as a matter of law due to an absence of conduct falling below the standard of care and a lack of proximate causation. *Hames, supra,* 808 *S.W.2d* at 45. Addressing first the proximate cause issue, the Tennessee Supreme Court found that the proximate cause of the decedent's death was the lightning bolt and not anything that the State may or may not have done:

While the argument can be made that the absence of lightning proof shelters and warning devices was to some extent responsible for the death, the rule is that where two distinct causes, unrelated in operation, one of them being the "direct cause" and the other furnishing the condition by which the injury was made

possible, the former alone is to be regarded as the proximate cause of the result. Even assuming that the failure to provide shelters or utilize warning devices was negligence, such failure merely furnished the condition by which lightning could strike the decedent.

[*Ibid.* (citation omitted).]

The court addressed the issue of whether the golf course deviated from the standard of care reasonable under the circumstances that was owed to golfers. First, the court found that "lightning is such a highly unpredictable occurrence of nature, that it is not reasonable to require one to anticipate when and where it will strike.... [T]he risk to be guarded against is too remote to impose legal liability." *Ibid.* The *Hames* court also emphasized that it was "reasonable to infer that a reasonably prudent adult can recognize the approach of a severe thunderstorm and know that it is time to pack up the clubs and leave before the storm begins to wreak havoc." *Ibid.*

The court deemed it "significant" that there was "no industry standard to implement warning devices or shelters that are lightning proof." *Ibid.* This conclusion was reinforced by the record, which showed that most golf courses did not provide either warning devices or lightning-proof shelters. *Ibid.* The latter evidence of customary conduct, although not conclusive or controlling, was found by the court to be relevant in considering whether the golf course had exercised ordinary care. *Id.* at 45–46. Finally, the Court noted that testimony regarding USGA rules indicated that those rules governed primarily tournament play and were inapplicable to the facts of the pendant case. *Id.* at 46.

While the *Hames* court found that there was no duty owed to golfers to protect them from lightning strikes, it left open the possibility that, had there been an industry standard or customary conduct of protecting patrons from lightning strikes, the result might have been different. In contrast, on the record reviewed in this case, there is *some* evidence in the record that other golf courses in the immediate area of the Club utilized various methods to protect their patrons.

The question of how far a golf course's obligation towards its patrons should extend has been addressed by one commentator who argues that the liability of golf courses should be assessed in light of the USGA guidelines. *See* Michael Flynn, *Lightning: A Double Hit For Golf Course Operators*, 6 *Marq. Sports L.J.* 133 (1995).

As pointed out by Professor Flynn:

[T]he major governing bodies of golf throughout the world, proscribe the following rule: "As there have been many deaths and injuries from lightning on golf courses, all clubs and sponsors of golf course competitions *are urged to take every precaution* for the protection of persons against lightning."

[Flynn, *supra*, 6 *Marq. Sports L.J.* at 143 (quoting *The United States Golf Association and The Royal and Ancient Golf Club of St. Andrews, Scotland, The Rules of Golf* 112–13 (1995) (emphasis added by Professor Flynn)).]

Professor Flynn suggests that reasonable care requires golf course operators to place conspicuous signs warning golfers of the dangers of lightning and indicating the proper response to a lightning storm. Also, according to Flynn, a golf course operator should use "a siren and golf course marshals or other personnel to warn golfers of approaching lightning and to usher golfers to safety." Flynn, *supra*, 6 *Marq. Sports L.J.* at 144. Professor Flynn states that "[m]ost golf courses have voluntarily adopted these precautionary steps or have involuntarily adopted these precautionary steps at the urging of the golf course insurer." *Id.* at 144–145. Professor Flynn does not suggest that shelters have become standard on golf courses but states that "golf courses that choose to provide weather shelters [should] construct lightning-proof weather shelters." *Id.* at 144. Additionally, Professor Flynn concludes his analysis of "reasonable care" by suggesting that high-tech automatic lightning protection systems *may* be required as a way to discharge a golf course's duty to its patrons but notes that such devices vary in cost and in their reliability. *Id.* at 145–49. The high cost of some of these devices might make them "unreasonable," according to Professor Flynn.

As recognized by the *Hames* court, golf course operators do owe a general duty to protect their patrons, but this duty does not necessarily extend to all potential harms. Although lightning is

foreseeable in the abstract, its occurrence is so random and unpredictable that the risk it poses is quite remote even to persons who frequent the open expanses of golf courses. Even a remote risk, however, can be foreseeable and can give rise to a duty.

### B.

It is the responsibility of the courts to determine the scope of tort liability. *See Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citing *Kelly v. Gwinnell,* 96 *N.J.* 538, 552, 476 *A.*2d 1219 (1984)). Before recovery will be allowed under a negligence theory, a defendant must first owe a duty to a plaintiff. *See, e.g., Carvalho v. Toll Bros. & Developers,* 278 *N.J.Super.* 451, 457, 651 *A.*2d 492 (App.Div.1995), *aff'd,* 143 *N.J.* 565, 675 *A.*2d 209 (1996). "Although a foreseeable risk is the indispensable cornerstone of any formulation of a duty of care, not all foreseeable risks give rise to duties." *Dunphy v. Gregor,* 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994); *accord Carvalho, supra,* 278 *N.J.Super.* at 458, 651 *A.*2d 492. Once the foreseeability of the injury has been established, considerations of fairness and policy will dictate whether the imposition of a duty is warranted. *Ibid.*

Traditionally, premises liability has been governed by the common law distinctions between trespassers, licensees, and invitees. The property owner was deemed to owed a different duty of care to a person on his or her land depending upon the category into which that person fit. Under this common law analysis, an "owner or possessor of property owes a higher degree of care to the business invitee because that person has been invited on the premises for purposes of the owner that often are commercial or business related." *Hopkins, supra,* 132 *N.J.* at 433, 625 *A.*2d 1110. To such an invitee, a landowner owed a "duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered." *Id.* at 434, 625 *A.*2d 1110.

The Supreme Court has recently questioned the validity of these age-old classifications. *See id.* at 435–39, 625 *A.*2d 1110. In *Hopkins, supra,* the Court stated that:

> The inquiry should be not what common law classification or amalgam of classifications most closely characterizes the relationship of the parties, but, as exemplified by our decision in *Butler [v. Acme Markets, Inc.,* 89 *N.J.* 270, 445 *A.*2d 1141 (1982)] supra,* whether in light of the actual relationship between the parties under all of the surrounding circumstances the imposition ... of a general duty to exercise reasonable care in preventing foreseeable harm ... is fair and just. That approach is itself rooted in the philosophy of the common law.
>
> [132 *N.J.* at 438, 625 *A.*2d 1110 (citing *Palsgraf v. Long Island R.R. Co.,* 248 *N.Y.* 339, 162 *N.E.* 99 (1928)).]

The *Hopkins* Court continued by stating that:

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.
>
> [132 *N.J.* at 439 (citations omitted).]

It is under this analytic framework that we explore the issue of whether defendant owed a duty to plaintiff in the case at bar.

## C.

The motion judge's decision took notice of the fact that a lightning strike is an act of God. The judge's decision was based on the idea that a defendant cannot be held liable for injuries that result from a lightning strike because a lightning strike is an act of God.

Traditionally, an act of God is the cause of an accident if it is a purely natural force that "could not have been prevented by any amount of foresight and pains and care reasonably to be expected of [a defendant]." *Nugent v. Smith,* 1 *C.P.D.* 423, 444 (C.A.1876) (cited in Denis Binder, *Act of God? or Act of Man?: A Reapprais-*

*al of the Act of God Defense in Tort Law,* 15 *Rev. Litig.* 1, 12 (1996)).

Under New Jersey law, a plaintiff can recover from a defendant even where the defendant's negligence coincides with an act of God. As stated by this court in *Andreoli v. Natural Gas Co.,* 57 *N.J.Super.* 356, 366, 154 *A.*2d 726 (App.Div.1959), "[a] defendant is not relieved from liability where there is proof of his negligence, combined with some independent or foreseeable intervening cause which occasions the harm." We went on to observe that, "[w]e have held it to be long-settled that 'when there has been a finding of wrongdoing which is an efficient and cooperative cause of the mishap, the wrongdoer is not relieved from liability by proof that an act of God was a concurring cause.' " *Id.* at 367, 154 *A.*2d 726 (quoting *Hopler v. Morris Hills Regional District,* 45 *N.J.Super.* 409, 416, 133 *A.*2d 336 (App.Div.1957)); *accord Van Cora v. Trowbridge Outdoor Adver. Corp.,* 18 *N.J.Super.* 1, 4, 86 *A.*2d 590 (App.Div.1952) ("he whose negligence joins with an act of God in producing injury is liable therefor" (citation omitted)). This view of liability is reflected in Model Jury Charge 5.14, which provides that:

> An act of God is an unusual, extraordinary and unexpected manifestation of the forces of nature, or a misfortune or accident arising from inevitable necessity which cannot be prevented by reasonable human foresight and care. If plaintiff's injuries were caused by such an event without any negligence on the part of the defendant, the defendant is not liable therefor.

> However, if the defendant has been guilty of negligence which was an efficient and cooperative cause of the mishap, so that the accident was caused by both the forces of nature and the defendant's negligence, the defendant is not excused from responsibility.

It is not clear, ultimately, how the act of God defense operates in the arena of recent tort jurisprudence. One commentator has argued that the act of God defense is "an anachronistic, mirror image of existing negligence principles. The defense no longer serves an independent useful purpose and should be subsumed into the duty issue of general negligence analysis." Binder, *supra,* 15 *Rev. Litig.* at 4.

Plaintiff also called our attention to *Bier v. City of New Philadelphia*, 11 *Ohio St.*3d 134, 464 *N.E.*2d 147 (1984), and *Macedonia Baptist Church v. Gibson*, 833 *S.W.*2d 557 (Tex.Ct.App.1992), in support of his position that both a third-party duty and a breach of that duty may be found in injury-producing events involving an act of God, such as lightning. In *Bier, supra,* plaintiffs were injured when lightning struck a metal-roofed picnic shelter furnished by defendant to plaintiffs without a lightning protection system. 464 *N.E.*2d at 148. According to the expert produced by plaintiffs, an outdoor shelter without such a system actually serves as an attractor for lightning strikes. *Id.* at 149. Although defendant attempted to avoid liability by pointing out that it could not be held responsible for an act of God, the Ohio Supreme Court held that liability would attach where an injury would not have occurred but for the concurring negligence. *Id.* at 148–49.

Similarly in *Macedonia, supra,* plaintiff was injured while leaving church by a "side flash" that occurred when lightning struck a lightning rod that had been negligently installed on the church steeple and travelled down its negligently placed grounding cables. 833 *S.W.*2d at 559. Under these circumstances, the *Macedonia* court refused to deem the accident an act of God as it was not due "directly and exclusively to natural causes, without human intervention." *Id.* at 560. Rather, the court found that the improper installation was the effective cause of the injury and imposed liability upon the defendant church. *Ibid.*

This line of cases stands for the proposition that where supposed precautionary measures actually and foreseeably *increase* the likelihood of a potentially lethal natural phenomenon and enhance the risk of injury, the negligent third party will not be excused from liability in any resulting accident simply because an act of God was involved. The present case is different, according to defendant, because defendant did nothing to increase the likelihood that lightning would strike the golf course.

We find that the approach taken by the courts in *Macedonia, supra,* and *Bier, supra,* is substantively correct. We prefer to

look at the act of God defense in light of the more holistic approach to tort analysis discussed by our Supreme Court in *Hopkins*. The act of God defense, in and of itself, does not exculpate defendant. Further analysis requires that we examine "basic fairness under all of the circumstances in light of considerations of public policy."

## III

As noted, *supra*, finding that one person owes a duty of reasonable care to another "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." *Hopkins, supra*, 132 *N.J.* at 439, 625 *A.*2d 1110. This determination requires the balancing of several factors: "the nature of the attendant risk"; "the opportunity and ability to exercise care"; and the "public interest in the proposed solution." *Ibid.*

A particular lightning strike is clearly unpredictable. There is no way that present technology can predict whether a bolt of lightning will strike a tree, a bush, a rock, or any of four golfers standing near them. Similarly, the path of a particular tornado or the eye of a hurricane may be difficult to predict. In the past these storms were truly acts of God; they came out of nowhere and unleashed tremendous destructive powers. Modern technology has rendered these storms more predictable. We now know, for example, when conditions are favorable for tornadoes, and we know by satellite imagery and computer modeling when a hurricane will strike land and the probability that it will hit at a particular place.[10] These once unforeseeable forces of nature must now be considered, at least to a great extent, foreseeable.

---

[10] According to Professor Flynn, "lightning kills up to 300 people per year" and "causes more human death and injury than tornadoes or hurricanes." Flynn, *supra*, 6 *Marq. Sports L.J.* at 135 (citing Torch Lewis, *Avoid Lightning ... and EPA's Excesses*, 75 *Bus. & Com. Aviation* 112 (1994)).

As noted by plaintiff's expert and by Professor Flynn, there is now technology available that makes lightning's *presence* more predictable. This being the case, the presence of lightning is less an act of God and more a predictable destructive force. Thus, "the nature of the attendant risk" is that it's presence is predictable, if not its individual manifestations.

Similarly, "the opportunity and ability to exercise care" in the case of lightning is now greater than it has been in the past. A golf course can warn golfers of what to do in the presence of lightning, can warn golfers of the approach of lightning by using signals, and can create and maintain lightning-proof shelters. A golf course can now also detect the existence of lightning by using some of the new technology that is detailed in Berger's preliminary expert report and in Professor Flynn's article.

Lastly, the "public interest in the proposed solution" is clear. The great popularity of golf makes the *reasonable* protection of golfers an important public interest. There are now more people walking around on open plains carrying bags of steel shafts than there have ever been.[11]

■ We find that when a golf course has taken steps to protect golfers from lightning strikes, it owes the golfers a duty of reasonable care to implement its safety precautions properly. We do not go so far as to hold that golf course operators have an absolute duty to protect their patrons from lightning strikes. We refrain from finding this greater duty because it may still be cost-prohibitive to make all golf courses adopt particular safety procedures.

■ Our holding has the following consequences. All golf courses have a duty to post a sign that details what, if any, safety procedures are being utilized by the golf course to protect its patrons from lightning. If a particular golf course uses no safety

---

[11] For a discussion of the recent popularity of golf see Flynn, *supra*, 6 *Marq. Sports L.J.* at 136, n. 19.

precautions, its sign must inform golfers that they play at their own risk and that no safety procedures are being utilized to protect golfers from lightning strikes. If, however, a golf course chooses to utilize a particular safety feature, it owes a duty of reasonable care to its patrons to utilize it correctly. This latter standard means, for example, that if a golf course builds shelters, it must build lightning-proof shelters; if a golf course has an evacuation plan, the evacuation plan must be reasonable and must be posted; if a golf course uses a siren or horn system, the golfers must be able to hear it and must know what the signals mean; and if the golf course uses a weather forecasting system, it must use one that is reasonable under the circumstances.

## IV

It is well settled that summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46–2(c). In determining whether there exists a genuine issue of material fact, a court must inquire "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). *See also Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 252, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202 (1986).

In *Brill*, the Court continued:

[A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.... The "judge's

function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

[*Id.* at 540, 666 *A.*2d 146 (citations omitted).]

A reviewing court employs the same standards as the trial court to determine whether the motion for summary judgment should have been granted or denied. *See Antheunisse v. Tiffany & Co., Inc.,* 229 *N.J.Super.* 399, 402, 551 *A.*2d 1006 (App.Div.1988), *certif. denied,* 115 *N.J.* 59, 556 *A.*2d 1206 (1989). Therefore, this court is constrained to inquire whether a reasonable factfinder could have resolved this matter in favor of plaintiff. If the response is in the affirmative, then the summary judgment was improvidently granted. If the response is in the negative, then summary judgment was appropriate.

■ In opposition to defendant's motion for summary judgment, plaintiff submitted plaintiff's affidavit, McHugh's statement, and Berger's preliminary expert report. In his report, Berger generally noted that in 1993 a device known as the "Sky Scan" was available to the Club that would have permitted the detection of lightning within a forty-mile radius of the Club. Berger stated that "[t]his technology was available at a reasonable, minimal investment to the Country Club, was portable and would have provided more time to institute an evacuation plan for golfers ... to the clubhouse." Additionally, Berger opined that "[c]ommon practice in golf course design, management and maintenance is to provide shelters in strategic locations on the golf course."

In plaintiff's affidavit, he attested to his familiarity with five other country clubs, geographically near the Club, each of which, he claimed, provided some type of shelter at various points throughout their golf courses and used a siren/horn system to warn golfers of a change in the weather. In his recorded statement, Michael McHugh identified one additional golf course that employed an early warning system which scanned for static electricity in the air. Additionally, as already noted, plaintiff contends that the warning notices were first posted in the Club after his injury.

It appears that, when viewed in the light most favorable to plaintiff, the evidential materials, along with the reasonable inferences that can be drawn from them, could lead a rational factfinder to the conclusion that: (1) the Club undertook to provide safety precautions for its patrons in the event of bad weather; (2) there is an industry standard or customary practice at other golf courses for how to protect patrons from inclement weather, including lightning; and (3) that the Club did not meet that standard. We find that "the evidence 'is [not] so one-sided that one party must prevail as a matter of law.'" *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146 (citations omitted).

Reasonable care under the circumstances might include any of the suggestions within Berger's report; yet, reasonable care under the circumstances might not include any these suggestions. Simply stated, we consider this to be a jury question. Similarly, it is possible that plaintiff was comparatively negligent for using his umbrella or, for that matter, for playing golf in those particular weather conditions. Again, these are jury questions. What is clear is that here the Club assumed a duty to warn its business invitees. The existence of safety techniques and safety precautionary devices and the possibility that there is an industry standard will establish the parameters within which a jury should determine whether defendant reasonably exercised the duty that it assumed. The ultimate question should not have been decided summarily.

Plaintiff's affidavit and Berger's preliminary expert report raise sufficient material issues to avoid summary judgment. On remand, the court must permit extensive discovery of pertinent industry data to help the ultimate finders of fact to determine what protection the Club offered to its golfers and whether the Club reasonably instituted and carried out these precautions.

With regard to the weather forecasting, a jury will have to determine whether the Club's use of NAFEC and the Weather Channel is reasonable under the circumstances. The jury may find that it was reasonable for the Club to use "Sky Scan" or

another high-tech device for detecting lightning. We note that Berger did not address the issue of the Sky Scan's susceptibility to failure, an issue raised by Professor Flynn.

Similarly, the jury will have to decide whether the Club's evacuation plan was acceptable and whether there was proper notice at the clubhouse of what to do in inclement weather. The parties disputed whether the warning signs were up at the time of the incident. Likewise, the jury will have to decide if the golfers were properly informed that they should seek shelter at the surrounding houses and whether these were proper intermediate shelters.

The matter is reversed and remanded for proceedings not inconsistent with this opinion.