OPINION
{¶ 1} Plaintiff-appellant ("plaintiff"), Cora Lautenschlager, appeals from a judgment of the Franklin County Court of Common Pleas granting a directed verdict in favor of defendant-appellee MidOhio Cardiology and Vascular Consultants, Inc. ("defendant" or "MidOhio Cardiology"). Because the trial court did not abuse its discretion when it determined plaintiff's identified expert witness was not qualified to offer opinion testimony, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} Alleging injuries sustained by plaintiff in a fall from a treadmill during a cardiac stress test on December 8, 2003, were the direct and proximate result of defendant's agent's negligence in administering the stress test, plaintiff sued MidOhio Cardiology and anonymous defendants in common pleas court in November 2004. By her complaint, plaintiff sought more than $25,000 in damages and demanded a jury trial. MidOhio Cardiology denied plaintiff's assertion of negligence.
 {¶ 3} Claiming that plaintiff's identified expert witness, Joel M. Chupp, RN, RVT, lacked specialized knowledge, skill, experience, training, or education to testify as an expert witness, in a pretrial motion defendant moved the trial court to bar Mr. Chupp from offering opinion testimony at trial. After conducting a pretrial hearing, the trial court reserved its ruling until after the parties had an opportunity to conduct a voir dire examination of Mr. Chupp at trial.[1]
 {¶ 4} After the parties examined Mr. Chupp on the voir dire, the trial court granted MidOhio Cardiology's motion to preclude Mr. Chupp from offering opinion testimony. At the close of plaintiff's presentation of evidence, defendant moved for a directed verdict under Civ. R. 50(A). Construing the evidence most strongly in favor of plaintiff, the trial court found that reasonable minds could come to but one conclusion, which was adverse to plaintiff. Accordingly, the trial court directed a verdict in favor of defendant. The trial court also denied plaintiff's motion for a mistrial. *Page 3 
 {¶ 5} From the trial court's judgment in favor of defendant, plaintiff assigns a single error for our consideration:
 The trial court erred with substantial prejudice to Plaintiff-Appellant Cora Lautenschlager, by ruling as a matter of law that Plaintiff-Appellant's expert witness, Joel Chupp, RN, RVT, was not competent to give opinion testimony regarding the issue of whether Defendant-Appellees deviated from the Standard of Care in their evaluation and treatment of Cora Lautenschlager.
 {¶ 6} "The determination of the admissibility of expert testimony is within the discretion of the trial court." Valentine v. Conrad,110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 9, reconsideration denied,111 Ohio St.3d 1418, 2006-Ohio-5083, citing former Evid. R. 104.[2] Such a determination will not be disturbed absent an abuse of discretion.Valentine, at ¶ 9, citing Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 616.
 {¶ 7} "`"The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."'" State v. Smith, Franklin App. No. 03AP-1157, 2004-Ohio-4786, at ¶ 10, quoting Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, quoting State v. Adams (1980),62 Ohio St.2d 151, 157. An unreasonable decision is one that is unsupported by a sound reasoning process. AAAA Enterprises, Inc. v. River Place CommunityUrban Redevelopment Corp. (1990), 50 Ohio St.3d 157, 161; see, also,Dayton ex rel. Scandrick v. McGee (1981), 67 Ohio St.2d 356, 359, citing Black's Law Dictionary (5 Ed.) (observing that "`[u]nreasonable' means `irrational'"); State v. Congrove, Franklin App. No. 06AP-1129,2007-Ohio-3323, at ¶ 9. An arbitrary attitude, on the other hand, is an attitude that is "`without adequate determining principle * * * not *Page 4 
governed by any fixed rules or standard.'" Scandrick, at 359, quoting Black's Law Dictionary (5 Ed.); see, also, Congrove, at ¶ 9. "Unconscionable" may be defined as "affronting the sense of justice, decency, or reasonableness." Black's Law Dictionary (8 Ed. 2004) 1561.
 {¶ 8} [A]n abuse of discretion involves far more than a difference in * * * opinion * * * The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an `abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * *"'" Huffman v.Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87, quoting State v.Jenkins (1984), 15 Ohio St.3d 164, 222, certiorari denied (1985),472 U.S. 1032, 105 S.Ct. 3514, rehearing denied (1985), 473 U.S. 927,106 S.Ct. 19.
 {¶ 9} When applying an abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court.Berk v. Matthews (1990), 53 Ohio St.3d 161, 169; Stockdale v. Baba,153 Ohio App.3d 712, 2003-Ohio-4366, at ¶ 54, citing Berk, at 169;Congrove, at ¶ 9; see, also, Valentine, at ¶ 9, citing Calderon v.Sharkey (1982), 70 Ohio St.2d 218, 222.
 {¶ 10} Here, the issue raised by plaintiff's sole assignment of error resolves to whether the trial court abused its discretion when it precluded plaintiff's identified expert witness, Joel M. Chupp, RN, RVT, from offering opinion testimony at trial. Stated differently, the issue raised by her sole assignment of error resolves to whether the trial *Page 5 
court acted unreasonably, arbitrarily, or unconscionably, when it barred plaintiff's identified expert witness from offering opinion testimony at trial.[3]
 {¶ 11} "There is no presumption that a witness is competent to give an opinion, and it is incumbent upon the party offering opinion testimony to show that the witness possesses the necessary learning, knowledge, skill, or practical experience to enable him to competently give such testimony." Tully v. Mahoning Exp. Co. (1954), 161 Ohio St. 457, paragraph two of the syllabus. Former 104(A), which was in effect at all times pertinent to the proceedings at issue, provided, among other things, that preliminary questions concerning the qualification of a person to be a witness shall be determined by the court, subject to provisions in former Evid. R. 104(B). See, also, former Evid. R. 104(B).[4] Former Evid. R. 104(A) further provided that "[i]n making its determination [a court] is not bound by the rules of evidence except those with respect to privileges."
 {¶ 12} Evid. R. 702(B) provides that a witness may testify as an expert if "[t]he witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[.]" See, also, Evid. R. 702 *Page 6 
(providing that a witness may testify as an expert if divisions [A], [B], and [C] of Evid. R. 702 are satisfied).[5] "Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." State v. Hartman (2001), 93 Ohio St.3d 274, 285, citingState v. Baston (1999), 85 Ohio St.3d 418, 423, reconsideration denied,86 Ohio St.3d 1421, certiorari denied, 528 U.S. 1049, 120 S.Ct. 587;State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 191; see, also, State v.Were, ___ Ohio St.3d ___, 2008-Ohio-2762, at ¶ 235; State v. Davis,116 Ohio St.3d 404, 2008-Ohio-2, at ¶ 148, reconsideration denied, ___ Ohio St.3d ___, 2008-Ohio-969, petition for certiorari and motion for leave to file in forma pauperis filed on June 4, 2008, sub nom. Davis v.Ohio, U.S. Supreme Court case No. 07-11308; State v. Drummond,111 Ohio St.3d 14, 2006-Ohio-5084, *Page 7 
at ¶ 113, motion to reopen denied (2007), 113 Ohio St.3d 1463,2007-Ohio-1722; State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶ 116, motion to reopen denied, 110 Ohio St.3d 1461, 2006-Ohio-4288, certiorari denied, ___U.S.___, 127 S.Ct. 122; State v. Foust,105 Ohio St.3d 137, 2004-Ohio-7006, at ¶ 77, reconsideration denied (2005),105 Ohio St.3d 1454, 2005-Ohio-763, motion to reopen denied (2005),106 Ohio St.3d 1478, 2005-Ohio-3978; State v. Williams, 99 Ohio St.3d 439,2003-Ohio-4164, at ¶ 69; State v. Thomas, 97 Ohio St.3d 309,2002-Ohio-6624, at ¶ 46, reconsideration denied, 97 Ohio St.3d 1498,2002-Ohio-7248, certiorari denied (2003), 539 U.S. 916, 123 S.Ct. 2295. Cf. State Auto Mut. Ins. Co. v. Chrysler Corp. (1973),36 Ohio St.2d 151, 160, quoting 21 Ohio Jurisprudence 2d 429, Evidence, Section 421 (stating that "[t]he test for determining the competency of an expert witness is * * * as follows: `* * * his qualification depends upon his possession of special knowledge which he can impart to the jury, and which will assist them in regard to a pertinent matter, which he must have acquired either by study of recognized authorities on the subject or by practical experience, and it must appear that he has an opinion of his own, or is able to form one, upon the matter in question'").
 {¶ 13} During the voir dire examination, Mr. Chupp testified that he is the manager of the cardiovascular services department at Wooster (Ohio) Community Hospital. (Tr., March 5, 2007, at 42-43.) Mr. Chupp testified that he holds a certificate in nursing and he is a registered nurse. Id. at 43. Mr. Chupp further testified that in 1990 he became a "vascular lab coordinator" at Wooster Community Hospital, where he trained on the job and later became a registered vascular technologist. Id. at 43-44. When asked what his duties as a registered vascular technician entailed, Mr. Chupp testified: "[N]oninvasive *Page 8 
vascular testing utilizing ultrasound, diagnosing blockage in cardiac environments as well as blockage in neck and blockage in the veins of extremities, in other words, the arms and the legs." Id. at 44-45. Mr. Chupp testified that he practiced as a registered vascular technologist from 1990 to 1996. Id. at 45.
 {¶ 14} According to Mr. Chupp, in 1996, he became the coordinator of the vascular lab as well as a newly opened "echo and cardiac sonographer lab." Id. Mr. Chupp testified: "I was more of a supervisor in that, but I continued my work in the vascular lab on more of a part-time basis, but also I functioned as a registered nurse, again in the echocardiology lab, where I did stress testing, and I primarily did the stress testing in the echo lab as well as my nursing portion of duties." Id. When asked what he meant when he testified that he did stress testing in the echo lab, Mr. Chupp testified:
 This stress testing procedure was done for patients who came to the hospital primarily with symptoms of chest pains or for arrhythmia and the doctor wanted to evaluate them, and what we would do is we would first image them by echo and then we would place them a on treadmill where we would hook them up to an EKG where we could monitor them, the protocol where we could stop the treadmill due to fatigue using the regular stop button, and then we would remove them from the treadmill, if need be, to cardiacally [sic] examine them again by echocard [sic] to determine if there is any change in their heart functions.
Id. at 46.
 {¶ 15} Mr. Chupp testified that, during the period from approximately 1996 to approximately 2003, he used a Case 16 machine when he administered an echocardiac stress test. Id. at 47-48. According to Mr. Chupp, in 2003, he was promoted to his current position where he "oversee[s] the activity of the cardiac vascular services, *Page 9 
including all aspects of vascular, echo, stress testing, and all aspects of all the diagnostic cardiology testing, EKGs." Id. at 48.
 {¶ 16} During the voir dire examination, upon questioning by plaintiff's counsel, Mr. Chupp described the difference between a "cardiolite stress test" and an "echo stress test." Id. at 49-50. When asked whether there was a difference in the use of a treadmill in both tests, Mr. Chupp testified:
 The only difference is in the use of the treadmill, and in both cases would be in the stress testing where we start and where we stop the treadmill suddenly, and then the patient is taken back to the examination bed.
 In the cardiolite testing is one where the patient reaches their heart rate, the treadmill is then slowed down and the patient is brought to a walk and there is a bit more recovery time, but the protocol is about the same protocol, primarily we use the same protocol as to the same speed of the treadmill, the same incline.
Id. at 50-51.
 {¶ 17} When asked whether he had been involved in cardiolite stress testing, Mr. Chupp answered affirmatively. Id. at 51. And, when asked in what manner he had been involved in cardiolite stress testing, Mr. Chupp testified:
 Primarily as a supervisor, coming in and out of the nuclear stress room and checking to see how the scheduling is going and monitoring if there are any problems that should occur in that stress room, such as problems with the computer, occasionally the computer will malfunction and I would go in and help them to either reset the computer or correct whatever that program is.
 Occasionally a patient will have issues on the treadmill and the technologist will ask me for an opinion, and then I'll go in and from time to time as needed, I may administer some pharmaceutical agent that is given during the stress test.
Id. at 51-52. *Page 10 
 {¶ 18} During the voir dire examination, upon questioning by defendant's counsel, Mr. Chupp testified:
 Q. [By Ms. Maryellen C. Spirito] And would you agree that the test in this case was a treadmill cardiolite nuclear stress test?
 A. That is correct.
 Q. All right. You are not a stress therapist, are you?
 A. That is correct, I am not.
Id. at 53.
 {¶ 19} When asked whether he had ever been involved in administering a cardiolite stress test, Mr. Chupp testified: "I have been involved but not personally myself performing a stress test solely, but I have been involved." Id. at 54. Clarifying his previous deposition testimony, Mr. Chupp also testified:
 The distinction is been involved or performed; and what I'm saying today, and I may not have understood at the time of the deposition, is that the statement involved, because by being involved I could be a second person in the room assisting with the stress test. So if you're saying have I performed independently, no, the answer is no, but if you're asking have I been involved in the performance of the stress test, then the answer is yes, and at my deposition perhaps I was not clear or that the question was misleading to me and I did not understand it.
Id. at 55.
 {¶ 20} Defendant's counsel further inquired of Mr. Chupp:
 Q. [By Ms. Spirito]: Have you ever been involved in a stress, cardiolite stress test where you have been the one working the computer?
 A. No, I have not.
 Q. Yet you're being critical of someone working the computer in a cardiolite stress test; is that correct? *Page 11 
 A. That's correct. That's because of my involvement in the echo stress test, which is pretty much identical to the cardiolite stress test.
 Q. It is not the same, is it?
 A. There are minor differences, yes, you're correct.
 Q. It is not identical, is it?
 A. No.
Id. at 56.
 {¶ 21} Defendant's counsel also inquired:
 Q. Now, when you were in this [patient's] record, you could not interpret this record on your own, could you?
 A. I had a few questions about it that I needed clarification on, yes.
 * * *
 Q. You had to speak to two people, two stress therapist people who do this work to figure out what this report said; is that true?
 A. Not all together true, no. I formed my opinion and then asked for clarification from two stress therapists, where I said, am I thinking clearly here? And that's the question I had.
 Q. Isn't it a fact when you first saw this report, you were confused?
 A. I was, I would say yes, I was, but it was not because of the report itself, but it was because of the lines drawn through a lot of the numbers and the changes that were made as to what the computer said, and that's what I had questions about.
 Q. Well, isn't it a fact you were confused because you did not know what duration of stage meant; is that correct? *Page 12 
 A. I had questions about time in phase, that is correct.
 Q. So you did not know what that meant without asking somebody?
 A. I needed clarification for that. I thought I knew what it meant, but I did my homework and I asked a couple people to make sure that I was thinking correctly.
 Q. You did not know what duration of stage mean and you had to ask someone?
 A. I clarified that with someone, yes.
 Q. The fact of the matter is, you clarified it with somebody who was a stress test therapist; is that correct?
 A. That is correct.
 Q. Now, in your deposition, you indicated that you did not know the difference in the duration of stage. Do you remember saying that in your deposition?
 A. Yes.
 Q. So, you did not know that on your own from your own knowledge and education and experience, you had to ask somebody what the difference was; is that correct?
 A. Yes.
 Q. So you come into this courtroom and you start to testify about time in phases and what they mean and duration of stage, what that means, and that is information you only understood after you spoke to somebody else who is not coming into this courtroom; is that correct?
 A. Yes.
Id. at 57-60.
 {¶ 22} Defendant's counsel also inquired of Mr. Chupp, as follows:
 Q. Also, one of the other things that confused you and you also told me during your deposition, and that's down here where it says, "manual"; is that correct? *Page 13 
 A. Yes.
 Q. Okay. And you do not know how this test started in the Case 16 protocol and yet this procedure is indicated in the manual and you did not understand that; is that correct?
 A. The experience I had on Case 16, I never had the opportunity to start out with the Bruce protocol and switch to the manual, that is correct.
 Q. So you did not understand when you read this report why it said manual here, all that is stated in the Bruce protocol; is that correct?
 A. That is correct.
 Q. So you had to ask somebody who is a stress therapist because you could not explain how that could be; is that correct?
 A. Yes.
 Q. So you want to come in and tell the jury how this manual here, and even though it's in the Bruce protocol, you're only able to tell this jury because this stress expert told you; is that correct?
 A. That is correct.
 Q. You're not basing any of this from your own personal knowledge, education and training, you had to ask somebody about what that means; is that correct.
 A. You are correct. But in summary, the test is — .
 Q. I'm not asking you that. What I'm asking you is — well, the reason I'm asking you these questions is to determine what you know from your own knowledge and education and experience, and you told us you're not a cardiologist or a vascular therapist, you do not know many of the things in this report or how to read them without talking to a third person who is neither coming into this courtroom to testify; is that correct? *Page 14 
 A. That is correct. But for clarification, you know, it was simply for clarification. I felt that I was doing my homework to make sure I was knowledgeable.
Id. at 60-61.
 {¶ 23} Mr. Chupp further testified as follows:
 Q. [By Ms. Maryellen C. Spirito] * * * So in order to express your opinions that you will be expressing to this jury, you will be indicating that you had to talk to Mr. Starcky; is that correct?
 A. Yes.
 Q. And Mr. Starcky is somebody who is a stress therapist; is that correct?
 A. Yes.
 Q. And he is not coming in here to testify; is that correct? A. That is correct.
 Q. As a matter of fact, in addition to Mr. Starcky, you went to a second stress therapist to find out or to make sure of what this report meant; is that correct?
 A. For further clarification to make sure all three of us agreed, yes.
 Q. And, of course, this, all of this report with respect to this exercise test; is that correct?
 A. Yes.
 Q. And you had to ask a second stress expert because you are not a stress expert, would you agree?
 A. I did not have to ask, but I chose to.
 * * * *Page 15 
 Q. I'm sorry to be argumentative, but I just asked you, you could not come to your own opinion, you had to ask Mr. Starcky; is that correct?
 A. Yes.
 Q. You're not changing that testimony, are you?
 A. It is how you're wording the question. Really, I did not put that much thought into it, and, you know, all I can tell you is that I formed my opinions before I talked to these other gentlemen, I simply went to them wanting to know if I was thinking with clarity and thinking correctly and to explain to me how this particular study was good from the Bruce manual, I did not understand that, that's very correct, and how the stages worked on the stress test, yes, and, you know, why basically they said what they did, and well, I felt that I had an understanding of it but I wanted to clarify that with these gentlemen, who did stress testing every day, and I am not in the room every day, but I wanted to understand more, have clarification as to what happened here.
 * * *
 Q. Then you also spoke to a third person about this case; is that correct?
 A. Yes. I spoke to Dr. Nicolozakes.
 Q. And one of the things you needed to talk to this third expert about, the cardiologist, Dr. Nicolozakes, was because you did not have your own knowledge or experience about this, is that correct, and, in fact, you had to ask Dr. Nicolozakes why a cardiologist would prefer a treadmill cardiolite stress test as opposed to an echo stress test, that is information that you had to get from somebody else; is that correct?
 A. I asked him the difference between the two, the difference from a cardiologist perspective, was one more accurate or better, and he indicated to me it was more a function-type thing, and I questioned him about that.
Id. at 62-65. *Page 16 
 {¶ 24} After the parties examined Mr. Chupp on the voir dire, the court inquired of plaintiff's counsel, as follows:
 THE COURT: Now, what information, what opinions are you attempting to elicit from this witness relative to your case, what do you wish to elicit from this witness?
 MS. MANDT: The opinion I'm asking Joel to express is one, whether the cardiology technician exercised correct care in the proper manner to do the assessment of the patient in this case, Mrs. Lautenschlager's cardio stress test, and if the technician used proper care prior to putting her on the treadmill, whether proper care goes to the next stage and whether it was appropriate to allow her to fall off the treadmill, that the person — to allow her to fall off the treadmill. That is the opinion I'm asking him to express.
(Tr., March 6, 2007, at 2.)
 {¶ 25} Granting defendant's motion to preclude Mr. Chupp from offering expert testimony, the trial court stated: "The Court had an opportunity to listen to the voir dire of this witness, to listen to the totality of this witness's testimony. Based on the information from voir dire, the Court does not find this witness's knowledge and education and experience rises to the level to testify relative to the things that are being sought relative to this, his decision as an expert witness, so the Court sustains the motion to exclude this witness's testimony." Id. at 3-4.
 {¶ 26} "It has been held that an expert witness is not required to be the best witness on any particular subject. * * * [I]t is also true that a witness may be qualified to testify as an expert on one subject but may not be qualified to testify as an expert on another related subject." Campbell v. The Daimler Group, Inc. (1996),115 Ohio App.3d 783, 793, appeal not allowed (1997), 78 Ohio St.3d 1456. (Citation omitted.) See, also, *Page 17 Nationwide Mut. Ins. Co. v. ICON Health Fitness, Inc., Franklin App. No. 04AP-855, 2005-Ohio-2638, at ¶ 8.
 {¶ 27} Here, plaintiff's identified expert witness, Joel Chupp, RN, RVT, conceded that he had never performed a cardiolite stress test. Mr. Chupp also admitted that he relied on the expertise of two stress therapists and a cardiologist to confirm his opinions related to plaintiff's cardiolite stress testing. Cf. Beard v. Meridia HuronHosp., 106 Ohio St.3d 237, 2005-Ohio-4787, at syllabus (holding that "[e]xpert witnesses are permitted to testify that their opinions are based, in part, on their review of professional literature"). Mr. Chupp further admitted that he had difficulty interpreting a report relating to plaintiff's cardiolite stress test.
 {¶ 28} Given Mr. Chupp's self-admitted lack of direct familiarity with cardiolite stress testing based on personal experience; his difficulty interpreting a report related to plaintiff's cardiolite stress test; and his self-admitted reliance upon two stress therapists and a cardiologist to confirm his opinions, we cannot conclude that the trial court's finding that Mr. Chupp's knowledge, education, and experience failed to rise to the level necessary to testify as an expert witness was unsupported by a sound reasoning process, lacked an adequate determining principle, or affronted a sense of justice, decency, or reasonableness. Cf. Campbell, at 793-794 (concluding that given a witness's admitted lack of familiarity with design characteristics of anchor bolts and his lack of training, education, or experience in engineering or accident reconstruction, a trial court did not act unreasonably, arbitrarily, or unconscionably in determining that a witness was not qualified to offer an opinion as to the cause of a building collapse); ICON Health Fitness, supra, at ¶ 10-11 (finding that, although a witness may have been qualified to *Page 18 
testify about the cause and origin of a fire, such a witness lacked knowledge and experience in matters relating to the design of power cords, and, therefore, this witness was not qualified to opine about the design of the power cord in question or any feasible, alternative designs available when the power cord was manufactured); Nichols v.Hanzel (1996), 110 Ohio App.3d 591, 598, appeal not allowed,76 Ohio St.3d 1496 (concluding that a trial court did not abuse its discretion by sustaining objections to questions put forth to an expert witness, who was board-certified in internal medicine and dermatology, because appellants failed to show that a witness had any specialized knowledge of osteonecrosis beyond an awareness that this disease was a possible side effect of corticosteroid use, and because appellants failed to show that the fields of dermatology or internal medicine overlapped orthopedic medicine, or that the identified expert witness received education or training in orthopedics).
 {¶ 29} Finding that the trial court's determination is supported by a sound reasoning process, does not lack an adequate determining principle, and does not affront a sense of justice, decency, or reasonableness, we therefore cannot conclude the trial court abused its discretion, or acted unreasonably, arbitrarily, or unconscionably when it determined Mr. Chupp was not qualified to offer an expert opinion as to whether a defendant's agents deviated from a standard of care when they administered plaintiff's cardiolite stress test. For these reasons, we overrule plaintiff's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
McGRATH, P.J., and KLATT, J., concur.
[1] Both parties agree that: (1) a pre-trial hearing was held; (2) at the hearing, the trial court reserved ruling on defendant's motion; and (3) a transcript of this pretrial hearing is unavailable. Absent a transcript of the pretrial hearing, the parties have not filed an App. R. 9(C) statement reflecting the evidence presented at the pretrial hearing. See, generally, App. R. 9(C) and (D); see, also, Knapp v.Edwards Laboratories (1980), 61 Ohio St.2d 197, 199 (explaining that "[t]he duty to provide a transcript for appellate review falls upon the appellant. This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record. * * * When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm").
[2] After the Supreme Court of Ohio issued Valentine, Evid. R. 104 was amended, effective July 1, 2007.
[3] By her assignment of error, plaintiff only challenges the trial court's determination precluding plaintiff's identified expert from offering opinion testimony. Plaintiff does not, however, challenge the granting of a directed verdict in favor of defendant or the trial court's denial of her motion for a mistrial. See, generally, Groob v.Keybank, 108 Ohio St.3d 348, 2006-Ohio-1189, at ¶ 14, reconsideration denied, 109 Ohio St.3d 1483, 2006-Ohio-2466 (stating that "[a]ccording to Civ. R. 50(A)(4), a motion for directed verdict should be granted when, after construing the evidence most strongly in favor of the party against whom the motion is directed, `reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party'"); see, also, Civ. R. 59 (new trials).
Absent any challenge by plaintiff to the directed verdict itself, we shall not review the trial court's grant of a directed verdict in favor of defendant. See, e.g., Toledo's Great Eastern Shoppers City, Inc. v.Abde's Black Angus Steak House No. III, Inc. (1986), 24 Ohio St.3d 198,202, citing former App. R. 12(A); C. Miller Chevrolet v. WilloughbyHills (1974), 38 Ohio St.2d 298, 301 (observing that "[i]t is certainly true * * * that in reviewing the judgment of a lower court, a court of appeals need only pass upon errors assigned and briefed; errors not specifically raised may be disregarded").
[4] Former Evid. R. 104(B) provided: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."
[5] Evid. R. 702 provides:
 A witness may testify as an expert if all of the following apply:
 The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result. *Page 1